**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

MORIAH AHARON;
JORDAN G. KUPPINGER, M.D.;
DAMON J. DETESO, M.D.;
ROSANNA CARUSO;
CHRISTOPHER PAYTON;                     CASE NO. 9:20-cv-80604-RKA
LEE ANGIOLETTI;                         CLASS ACTION
MARIANGELLA MANNING;                    JURY TRIAL DEMANDED
LYNNORA VASQUEZ; and
REBECCA MADDEN, each on
behalf of themselves, and all those
similarly situated,

Plaintiffs,

v.

CHINESE COMMUNIST PARTY;
PEOPLE'S REPUBLIC OF CHINA; and
PETROCHINA INTERNATIONAL
(AMERICA), INC.

Defendants.
_____/

**PLAINTIFFS' MOTION FOR THE COURT TO FIND**
**SUBJECT MATTER JURISDICTION UNDER THE F.S.I.A.**
**<u>FOR THE PURPOSES OF DEFAULT FINAL JUDGMENT</u>**

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... ii

Preliminary Statement................................................................................................... 1

Procedural Posture ....................................................................................................... 2

Memorandum of Law .................................................................................................... 3

I.   Factual Background .................................................................................................. 3

   A.  The Wuhan Epicenter and Coverup ..................................................................... 4

   B.  The Lack of PPE in the U.S. Due to Defendants' Conduct .................................... 5

II.  Defendants are Subject to this Court's Jurisdiction ................................................. 6

   A. The Commercial Activity Exception Applies to Defendants' Acts ......................... 7

      1.   This lawsuit is based upon acts that took place outside the United States .................. 8

      2.   The acts were taken in connection with a commercial activity ..................................... 9

      3.   The acts caused a direct effect in the United States.................................................... 11

      4.   Alternatively, the commercial activity exception applies because of acts by Defendants within the United States.............................................................................. 13

   B.  The Tortious Conduct Exception Applies to Defendants' Acts.......................... 14

      1.   Defendants' policies left no room for independent judgment ..................................... 15

      2.   Defendants cannot prove the discretionary function exception was designed to shield their acts ............................................................................................................ 16

Certificate of Compliance with Local Rule 7.1(a)(3) .................................................. 18

Certificate of Service ................................................................................................... 19

## TABLE OF AUTHORITIES

*Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323 (11th Cir. 2003) .........................9,10

*Berkovitz v. United States*, 486 U.S. 531 (1988) ...............................................15–17

*Cope v. Scott,* 45 F.3d 445 (D.C. Cir. 1995)..........................................................16,17

*De Csepel v. Republic of Hungary,* 714 F.3d 591 (D.C. Cir. 2013) .....................7,12,13

*Devengoechea v. Bolivarian Republic of Venezuela,* 889 F.3d 1213 (11th Cir. 2018) ............7–10

*Frank v. Comm. of Antigua & Barbuda*, 842 F.3d 362 (5ᵗʰ Cir. 2016)..............................7

*Guevara v. Republic of Peru,* 608 F.3d 1297 (11th Cir. 2010)......................................10

*Harris Corp. v. Nat'l Iranian Radio & Television,* 691 F. 2d 1344 (11th Cir. 1982) .................11

*Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*, 129 F.3d 543 (11th Cir. 1997)..............10

*Lempert v. Republic of Kazakstan,* 223 F. Supp. 2d 200 (D.D.C. 2002).........................13

*Letelier v. Rep. of Chile*, 488 F. Supp. 665 (D.D.C., 1980)........................................n.5

*MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918 (D.C. Cir. 1987)..................14

*OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015) ...........................................8

*Red Lake Band of Chippewa Indians v. United States,* 800 F.2d 1187 (D.C. Cir. 1986) ............16

*Repub. of Argentina v. Weltover Inc.,* 504 U.S. 607 (1992) ....................................9–12

*Samco Global Arms, Inc. v. Arita*, 395 F.3d 1212 (11th Cir. 2005) ..................................12

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)......................................6,8,10,11

*Stena Rederi AB v. Comision de Contratos,* 923 F.2d 380 (5ᵗʰ Cir. 1991) .......................7

*Swafford v. United States,* 839 F.3d 1365 (11th Cir. 2016)........................................15

*United States v. Carmack,* 329 U.S. 230 (1946)................................................9,10

*United States v. Gaubert,* 499 U.S. 315 (1991) ................................................15,16

*Usoyan v. Republic of Turkey,* 6 F.4th 31 (D.C. Cir. 2021)....................................14–17

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983).................................n.1

*Westfall v. Erwin,* 484 U.S. 292 (1988) .............................................................15

*Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511 (D.C. Cir. 1988) ...........................13

## <u>RULES & STATUTES</u>

28 U.S.C. § 1330(a) .................................................................................3

28 U.S.C. § 1330(b) ...............................................................................n.3

Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1332(a), (d) ..........................3

Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a) ..........................................14

Foreign Sovereign Immunities Act of 1976 (FSIA) 28 U.S.C. 1602 *et seq.* ..................1

FSIA § 1603(d) ......................................................................................9

FSIA § 1605 .........................................................................................6

FSIA § 1605(a)(2) ..............................................................................1,7,13

FSIA § 1605(a)(5) ..............................................................................2,7,14

FSIA § 1607 .........................................................................................6

FSIA § 1608(a)(4) ..................................................................................2

FSIA § 1608(2) .....................................................................................2

iii

## **MISCELLANEOUS**

Black's Law Dictionary (6th ed. 1990).........................................................................9,11

Black's Law Dictionary (11th ed. 2019).........................................................................8

F. Scott Kieff, *Business, Risk & China's MCF: Modest Tooks of Financial Regulation for a Time of Great Power Competition*, Geo. Wash. L. Rev. (Vol. 88, Dec. 2020) ...............n.4

H.R. Rep. 94-1487 (1976), as reprinted in 1976 U.S.C.C.A.N. 6604 ...........................14

Plaintiffs, by and through undersigned counsel, hereby respectfully file this Motion for the Court to find that it has subject matter jurisdiction under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602, *et seq*. (FSIA), for the purposes of an eventual entry of default final judgment against Defendants Chinese Communist Party (CCP) and the People's Republic of China (PRC).  This motion is made pursuant to the Court's October 25, 2023 Order, [DE 112], as modified by its November 5, 2023 Paperless Order, [DE 115], clarifying that the Parties should first focus on whether the Court has subject matter jurisdiction under exceptions to sovereign immunity embodied in the FSIA.  In support thereof, Plaintiffs further state:

## PRELIMINARY STATEMENT

Plaintiffs filed a First Amended Class Action Complaint on July 6, 2020, [DE 19, (and attached as **Exhibit A**)], on behalf of putative classes of aggrieved and injured claimants who were on the front lines of the COVID-19 pandemic as first responders and medical caregiving personnel, and who did not have access to adequate supplies of personal protective equipment (PPE) because of the alleged hoarding of PPE supplies, and other related conduct, by Defendants.  As a result of being unable to procure proper or adequate PPE, these claimants were unnecessarily exposed to the virus and suffered injury, damage, and loss as a result.  Although principles of "grace and comity" have traditionally barred suits against nonconsenting foreign states in U.S. courts,[1] the FSIA provides several exceptions to sovereign immunity so that such suits may be maintained when warranted.

Plaintiffs posit that two of those exceptions to sovereign immunity apply here:  the commercial activity exception (28 U.S.C. § 1605(a)(2)); and the tortious conduct exception (§

---

[1] *See*, *e.g.*, *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983).

1605(a)(5)).  Therefore, the Court may find that it has subject matter jurisdiction and proceed to briefing on the merits of Plaintiffs' claims so that the PRC and CCP may be held accountable here for their hoarding of the PPE in the lead up to the pandemic and the resulting injuries to Plaintiffs and the putative class members.

## PROCEDURAL POSTURE

After the First Amended Complaint (FAC) was filed, Plaintiffs followed through with service of process on the PRC and CCP pursuant to the Hague Convention as mandated by the FSIA under § 1608(2).  On February 7, 2021, the PRC's Ministry of Justice transmitted a letter to undersigned and the Court, [DE 42], refusing service because this action "would infringe the sovereignty or security of the People's Republic of China (Article 13)."  The Ministry was referring to Article 13 of the Hague Convention.  Plaintiffs subsequently sought leave to continue their service efforts pursuant to § 1608(a)(4) via the U.S. State Department and diplomatic channels. [DE 53].

On November 23, 2021, the Court referred the motion to Magistrate Judge Bruce E. Reinhart, and Judge Reinhart recommended the grant of Plaintiff's motion, which the Court adopted on December 20, 2021.  [DE's 61, 64].  The State Department did not serve the PRC and the CCP through the Beijing Embassy until January 18, 2023.  [*See* DE 84-1, p. 1].  China responded that it still refused to accept service through a "diplomatic note" on February 2, 2023, [*id.*], and Briant S. Platt, Consul of the United States at the U.S. Embassy Beijing certified service. [DE 84-1, p. 2].  Plaintiffs filed their Motion to Find Service Has Been Effectuated, [DE 101], and the Court granted the motion on October 23, 2025, [DE 106], and subsequently ordered the Parties

to conduct this briefing in its steps to determine if default final judgment may be entered against the PRC and the CCP.[2]

## MEMORANDUM OF LAW

The Parties have been first tasked with briefing the Court on whether exceptions to sovereign immunity apply to the action here such that the Court may find that it has subject matter jurisdiction as to claims against the CCP and PRC.[3]  Plaintiffs have further alleged that the Court has original jurisdiction pursuant to 28 U.S.C. § 1330(a), as this is a civil action against a foreign state, should the Court find the FSIA exceptions apply.  Plaintiffs have also further alleged diversity jurisdiction pursuant to the Class Action Fairness Act of 2005 (28 U.S.C. § 1332(a) and (d)), but do not address the class action status here as it would be the subject of later briefing if the Court agrees with Plaintiffs at this threshold.

## I.     Factual Background

Although this briefing is restricted to whether or not the Court may find that exceptions to sovereign immunity exist here, and not the merits of Plaintiffs' claims, the factual background, as alleged by Plaintiffs, is instructive as to why the exceptions exist.  Plaintiffs have attached the FAC and hereby incorporate its "general allegations" (¶¶ 31–156) as if fully stated herein.  However, some of the allegations are particularly relevant to this briefing.

---

[2] As part of the process of finding that service had been effectuated, Plaintiffs stipulated to the CCP being considered sovereign for the purposes of this litigation, which was an alternative position of their jurisdictional allegations in the FAC. (*See* Ex. A, FAC, ¶ 28).
[3] As the Court has already determined that service has been effectuated on the PRC and CCP, Plaintiffs posit that the Court now has personal jurisdiction over those Defendants, as well as pursuant to 28 U.S.C. § 1330(b).

## A.  The Wuhan Epicenter and Coverup

Plaintiffs allege, and it has been generally accepted, that the epicenter of the outbreak of the virus was in Wuhan, China — either because of "gain of function" manipulation of bat-derived coronaviruses at the Wuhan Institute of Virology (WIV) and a subsequent leak of what would become known as COVID-19; or because of a natural zoonotic transmission from one of Wuhan's exotic animal "wet markets."  (FAC, ¶¶ 31–53).  In the former scenario, the roots of the pandemic are found in a combination of WIV's agenda to manipulate viruses and its rather shoddy safety and containment record and protocols.  (*See* FAC ¶¶ 36–44).  In the latter scenario, China's quiet tolerance of, and participation in the market of exotic animals, along with unhygienic conditions at the "wet market" created a literal breeding ground for the animal to human transmission of the virus.  (*See* FAC ¶¶ 45–49).

In either scenario, China knew it had a problem on its hands by at least the beginning of December, 2019 and actively concealed it.  (*See*, *e.g.*, FAC ¶¶ 57–59).  Despite investing billions of dollars into a Surveillance Reporting System (SRS) after the 2003 SARS epidemic to track and control the outbreak of similar viruses, the CCP controlled Wuhan Health Commission (WHC) forbade Wuhan hospitals and doctors to enter information about the emerging COVID-19 virus into the SRS.  (*See* FAC ¶¶ 54–56). By later December it was becoming apparent to the staff at Wuhan hospitals (and the WHC) that there was an exponential rise in cases and that the virus was being easily transmitted human-to-human with deadly consequences. (*See* FAC ¶¶ 60–65). Wuhan doctors were using social channels to warn their colleagues, but on December 30, 2019, the WHC shut down the interaction and prohibited any sharing of treatment information without authorization. (*See* FAC ¶¶ 66–70, 74–76, 83, 86).  Instead, the WHC told the world on December

31st that there was no evidence of human-to-human transmission, and the police began broadcasting prosecution of those doctors who still spoke out. (*See* FAC ¶¶ 73, 76–79).

Chinese officials misled the World Health Organization into repeating its misinformation about human-to-human transmission in early January 2020, while China allowed large public gatherings to continue in Wuhan for the New Year and Lunar New Year.  (*See* FAC ¶¶ 88–93, 116–119). On January 11, 2020, the WHC issued a statement saying, "[a]ll 739 close contacts, including 419 medical staff, have undergone medical observation and no related cases have been found . . . . No new cases have been detected since January 3, 2020. At present, no medical staff infections have been found, and no clear evidence of human-to-human transmission has been found."  (FAC ¶ 99). By the time the WHC publicly confirmed human-to-human transmission on January 20, 2020, the damage had been done.  (*See*, *e.g.*, FAC ¶¶ 101–107, 121–123). Quarantining of Wuhan residents did not begin until January 23rd. (FAC ¶ 109). With knowledge of an outbreak of a deadly, infectious virus, China had imposed no prior travel restrictions, allowing direct flights from Wuhan to cities across the world, including many in the United States, carrying hundreds of thousands of potential carriers of the virus.  (FAC ¶ 114, 116).

**B.  The Lack of PPE in the U.S. Due to Defendants' Conduct**

Against this backdrop, the CCP and PRC carried out a hoarding and cornering of the market scheme for PPE before it finally admitted to the world it had a COVID-19 problem.  PPE consists of medical grade face masks (such as the N95 mask), face and eye shields, and other protective garments and accessories that prevent the respiratory droplets or aerosolized virus from reaching the eyes, nose, and mouths of the medical providers. (FAC ¶ 134). The reports are legion that medical care providers in the U.S. were unable to procure adequate supplies of PPE during the worst time of pandemic. (FAC ¶¶ 135–136). The lack of adequate supplies is the direct result of

Defendants' hoarding of PPE from supplies around the world as well as preventing their factories from exporting PPE, at the time Defendants knew of the outbreak but before they allowed the information to become public.  (*See*, *e.g.*, FAC ¶¶ 139–141, 149).

China is the dominant manufacturer worldwide of PPE supplies, yet in January 2020 it began importing billions of pieces of PPE from supplies around the world. (FAC ¶¶ 141, 149–150).  The Department of Homeland Security's intelligence arm found that "the Chinese Government intentionally concealed the severity of COVID-19 from the International community in early January while it stockpiled medical supplies by both increasing imports and decreasing exports . . . ."  (FAC ¶ 142).  It even enlisted employees of Chinese owned businesses in other countries, including the U.S. and Defendant PetroChina America, to scour stores and suppliers in their area for masks (especially N-95) and other PPE, and ship it back to China. (*See*, FAC ¶¶ 143–148). Bloomberg News reported that it saw a copy of the memo sent to PetroChina America with the instructions to buy as many masks as possible for export back to China.  (FAC ¶ 147).

The hoarding of PPE supplies and its dominance in manufacturing and curtailing of exports, meant that Plaintiffs and the members of the putative classes could not procure adequate supplies of PPE and were unnecessarily exposed to the virus while trying to fulfill their mission as medical care givers to a pandemic plagued populace.

## II.     Defendants Are Subject to this Court's Jurisdiction

Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see* 28 U.S.C. § 1605 (listing exceptions). Where, as here, a plaintiff has "assert[ed] at least some facts that would establish [an] exception [to immunity under 28 U.S.C. §§ 1605-1607]," a defendant

claiming immunity "bears the ultimate burden of proving the nonapplicability of the exception." *Stena Rederi AB v. Comision de Contratos*, 923 F.2d 380, 390 n.14 (5th Cir. 1991); *see also Frank v. Comm. of Antigua & Barbuda,* 842 F.3d 362, 367 (5th Cir. 2016).

Here, Defendants are unable to sustain their burden of proving the nonapplicability of either of two exceptions: for commercial activity (28 U.S.C. § 1605(a)(2)) or their tortious conduct (§ 1605(a)(5)). Thus, neither the CCP nor the PRC is entitled to immunity.

## A.      The Commercial Activity Exception Applies to Defendants' Acts

Separate and independent of any other exception that may apply, Defendants' wrongful conduct plainly falls under the commercial activity exception of 28 U.S.C. § 1605(a)(2), which provides an exception

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

§ 1605(a)(2). The Defendants' scheme was principally abroad, thus, as relevant here, the third clause of the commercial-activity exception provides jurisdiction over a foreign state when "the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." § 1605(a)(2).

To invoke jurisdiction under this clause, "(1) the lawsuit must be based upon an act that took place outside the territory of the United States; (2) the act must have been taken in connection with a commercial activity; and (3) the act must have caused a direct effect in the United States." *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1224 (11th Cir. 2018) (quoting *de Csepel v. Republic of Hungary*, 714 F.3d 591, 598 (D.C. Cir. 2013)) (cleaned up).

**1.      This lawsuit is based upon acts that took place outside the United States.**

"[A]t the first step in a commercial-activity-exception case, [courts] must identify the conduct upon which the suit is based." *Devengoechea*, 889 F.3d at 1222 (citing *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33 (2015)). The FSIA itself "does not elaborate on the phrase 'based upon.'" *Sachs*, 577 U.S. at 33. The Supreme Court has noted that "the relatively sparse legislative history offers no assistance." *Nelson*, 507 U.S. at 357.

When assessing what act a suit is "based upon," courts consider the lawsuit's "basis" or "foundation." *Id.* (citations omitted). That, in turn, requires courts to look at the "particular conduct" that constitutes the "gravamen" of the suit. *Devengoechea*, 889 F.3d at 1222 (citing *Sachs*, 577 U.S. at 33). "In other words, [courts] focus on the 'core' of the suit—the foreign state's 'acts that actually injured' the plaintiff." *Id.* (quoting *Sachs*, 577 U.S. at 33); *see also* "Gravamen," Black's Law Dictionary (11th ed. 2019) (defining "gravamen" as "[t]he substantial point or essence of a claim, grievance, or complaint."). Courts look to the "elements of a claim that, if proven, would entitle a plaintiff to relief." *Nelson*, 507 U.S. at 357. Further, courts compare the plaintiff's "theory of the case" and the facts the plaintiff's "claims turn on" with the act the plaintiff claims lies as the basis of the lawsuit. *Sachs*, 577 U.S. at 35.

To zero in on the gravamen of the case at bar, this lawsuit is based on trade in the mask and PPE market by Defendants, and the harm sustained by Plaintiffs stemming from Defendants' manipulation of the mask and PPE market. No uniquely-governmental activity lies at the foundation of Plaintiffs' claims.  (*See* FAC ⁋⁋ 1–6, 24, 26, 53, 141, 154, 155). To the contrary, private companies, independent research laboratories, educational institutions and individual scientists worldwide actively pursue the mask and PPE market. By manipulating this market, Defendants engaged in harmful economic activity that posed a risk to other market participants, including Plaintiffs. When Defendants engaged in improper conduct in this market, Defendants'

conduct harmed Plaintiffs and led directly to the claims alleged in this lawsuit. Much of this conduct occurred in China, far from America's shores, and thus indisputably took place "outside the United States." *Id.*

The FAC has nothing whatsoever to do with a complaint based upon quintessential government conduct, such as expropriation, at issue in numerous reported cases. *See, e.g.*, *United States v. Carmack*, 329 U.S. 230, 236–37 (1946); *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1324 (11th Cir. 2003).

Defendants cannot possibly carry their burden to negate this element on this record. There has never been a reported decision holding that a lawsuit challenging the core acts concerning manipulation of the mask and PPE market, where: the harm flowed directly from those acts providing the foundation of the claims and upon which the claims were based; were made under Plaintiffs' theory of the case and the facts on which the claims turn and thus the elements of the claims that, if proven, will entitle Plaintiffs to relief here; did not form the "gravamen" of the lawsuit. (*See* FAC ¶¶ 24 (Defendants were market participants); 26 (overarching scheme by Defendants); 53 (manipulating market for masks and PPE after having caused pandemic); 141 (cornered relevant market); 154 (hoarded masks and PPE); 155 (Plaintiffs' harm included death, infection and other emotional and physical harm)).

## 2. The acts were taken in connection with a commercial activity.

Under the FSIA, an activity is "commercial activity" if it is "either a regular course of commercial conduct or a particular commercial transaction or act." *Devengoechea*, 889 F.3d at 1220 (quoting 28 U.S.C. § 1603(d)). To decide whether an activity is commercial, courts look at "whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'" *Repub. of Argentina v. Weltover*, 504 U.S. 607, 614 (1992) (quoting Black's Law Dictionary 270 (6th ed.

1990)). Assessing the commercial character of an act "is a question of behavior, not motivation." *Nelson*, 507 U.S. at 360.

A foreign state engages in commercial activity "where it acts in the manner of a private player within the market" or "where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Id.* (internal quotation marks omitted). Conversely, "[p]ublic acts ... require sovereign power and thus cannot be performed by a private party." *Beg*, 353 F.3d at 1325 (citing *Weltover*, 504 U.S. at 614–16). Public acts "make use of the state's sovereign authority." *Id.*

As noted in the prior section, expropriation is an example of the exercise of sovereign power. *See, e.g.*, *Carmack*, 329 U.S. at 236–37 (stating that "[t]he power of eminent domain is essential to a sovereign government"); *Beg*, 353 F.3d at 1324. In contrast, engaging in commercial or scientific pursuits are not public acts, even if the general topic touches upon public concern. *See, e.g.*, *Weltover*, 504 U.S. at 614–15 ("[A] contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods.").

Nothing about participating in the mask and PPE market is uniquely or peculiarly sovereign in nature. *See, e.g.*, *Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*, 129 F.3d 543, 548–49 (11th Cir. 1997) (breach of contract to pay for "goods and services"—a "marketplace activity" available to "private persons"); *Guevara v. Republic of Peru*, 608 F.3d 1297, 1301 (11th Cir. 2010) ("[T]he oldest American decision recognizing a commercial activities exception to sovereign immunity involved a reward for capture."); *Weltover*, 504 U.S. at 615 (explaining that "[t]he commercial character" of the bonds was "confirmed by the fact that they [were] in almost all respects garden-variety debt instruments[ ]"); *Devengoechea*, 889 F.3d at 1221–22 ("Nothing

10

about [breaching a bailment agreement] is uniquely or peculiarly sovereign in nature."). Defendants here engaged in the marketplace activity of participating in the mask and PPE market—economic activity that can be—and is—conducted by private actors worldwide.

Pfizer, Merck, Moderna and virtually every other pharmaceutical company; Rockefeller University, Lawrence Livermore Laboratories and countless other private research institutions; universities throughout the world; and inventors and scientists in many nations all actively engage in mask and PPE research and development. Communist China and its instrumentalities, including Defendants here, cannot transform private, commercial activity into the exercise of sovereign power merely by taking action in the market for masks and PPE, even if they were seeking to promote a public purpose. Courts look to the "behavior, not motivation" behind an act. *Nelson*, 507 U.S. at 360. Participating in the mask and PPE market is the type of action by which a private party engages in "'trade and traffic or commerce.'" *See Weltover*, 504 U.S. at 614 (quoting Black's Law Dictionary 270 (6th ed. 1990)).

### 3. The acts caused a direct effect in the United States.

Under the FSIA, a "direct effect" is one that follows "as an immediate consequence of the defendant's ... activity." *Weltover*, 504 U.S. at 618 (citation omitted). The effect must be more than "purely trivial" or "remote and attenuated," but it need not be a substantial or foreseeable effect. *Id.* In evaluating a "direct effect," courts ask: "[W]as the effect sufficiently 'direct' and sufficiently 'in the United States' that Congress would have wanted an American court to hear the case?" *Guevara*, 608 F.3d at 1309 (quoting *Harris Corp. v. Nat'l Iranian Radio & Television*, 691 F.2d 1344, 1351 (11th Cir. 1982) (internal citation and quotation marks omitted)).

The Supreme Court in *Weltover* explained the meaning of "direct effect." In that case, Argentina and its bank sold bonds to raise United States dollars to repay their foreign debts when they matured. *Weltover*, 504 U.S. at 609–10. The plaintiffs, who had bought some of these bonds,

designated New York as the place of payment and sued Argentina when it failed to pay after it unilaterally rescheduled the time for payment. *Id.* at 610. Based on the fact that New York was "the place of performance for Argentina's ultimate contractual obligations," the Supreme Court concluded that Argentina's rescheduling of its obligations to repay the bonds "necessarily had a 'direct effect' in the United States: money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id*. at 619. The Eleventh Circuit interpreted *Weltover* to stand for the proposition that a "direct effect" occurs in the United States when "monies or goods [are] due in the United States." *Samco Global Arms, Inc. v. Arita*, 395 F.3d 1212, 1217 (11th Cir. 2005).

A "direct effect" in the United States occurred, for example, in a case decided by the District of Columbia Circuit. *De Csepel*, 714 F.3d 591, involved the Herzog Collection, "one of Europe's largest and finest private art collections." *Id.* at 594. During the Holocaust, the Hungarian government, acting in conjunction with Nazi Germany, had seized the Collection from the *de Csepel* plaintiffs' ancestors. *Id.* at 594–95. After World War II ended, the plaintiffs alleged, the Hungarian government reached bailment agreements with them concerning the Herzog Collection. *Id.* at 596. Under the alleged agreements, upon demand, the Hungarian government had "a duty ... to return" the property to the plaintiffs, whom it knew to reside in the United States. *Id.* at 596, 601. When Hungary failed to return the Herzog Collection, the plaintiffs sued for bailment, conversion, constructive trust, accounting, declaratory relief, and restitution based on unjust enrichment. *Id.* at 596.

The District of Columbia Circuit concluded that jurisdiction existed under the third clause of the commercial-activity exception. *Id.* at 601. In reaching this determination, the Court explained that Hungary's refusal to return the property to the plaintiffs in the United States caused

the requisite "direct effect" in the United States. *Id.* While the complaint did not expressly allege that the return of the artwork was to take place in the United States, significantly, the court opined that "this is fairly inferred from the complaint's allegations that the bailment contract required specific performance—i.e., return of the property itself—and that this return was to be directed to [the plaintiffs] Hungary knew to be residing in the United States." *Id.*

Here, there has never been a credible suggestion that the harm sustained by Plaintiffs emanated from anywhere other than Defendants' acts. The harm suffered by Plaintiffs was directly caused solely by Defendants' acts—a more direct effect cannot be posited. (*See* FAC ⁋ 155) (Plaintiffs' harm included death, infection, and other emotional and physical harm). As such, Defendants cannot remotely carry their burden to prove the absence of a direct effect on Plaintiffs from Defendants' acts.

### 4. Alternatively, the commercial activity exception applies because of acts by Defendants within the United States.

Alternatively, given the additional conduct alleged by Plaintiffs to have taken place within the United States by agents and representatives of the CCP and PRC, the second clause of § 1605(a)(2) — "or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere" — also applies here. Courts look to whether the alleged acts of commercial activity in the U.S. are sufficient in and of themselves to form the basis for a cause of action. *Lempert v. Republic of Kazakstan*, 223 F. Supp. 2d 200, 203 (D.D.C. 2002) (citing *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1514 (D.C. Cir. 1988)). Here, Plaintiffs allege that Defendants acted to buy up any and all available supplies of PPE in the U.S., which in and of itself, caused shortages of PPE in the U.S., thereby causing Plaintiffs' injuries and damages, and forming the basis of their causes of action. (*See*, *e.g.*, FAC ¶¶ 174-175; Count VI).

**B.       The Tortious Conduct Exception Applies to Defendants' Acts**

Defendants' wrongful conduct clearly falls under the tortious conduct exception of 28

U.S.C. § 1605(a)(5). The tortious conduct exception, which affords a separate and independent

basis for the exercise of jurisdiction over Defendants here, provides an exception for any case:

> not otherwise encompassed in paragraph (2) above, in which money damages are
> sought against a foreign state for personal injury or death, or damage to or loss of
> property, occurring in the United States and caused by the tortious act or omission
> of that foreign state or of any official or employee of that foreign state while acting
> within the scope of his office or employment; except this paragraph shall not apply
> to--
>
> (A) any claim based upon the exercise or performance or the failure to exercise or
> perform a discretionary function regardless of whether the discretion be abused, or
>
> (B) any claim arising out of malicious prosecution, abuse of process, libel, slander,
> misrepresentation, deceit, or interference with contract rights;

§ 1605(a)(5).

First, there is no question that a significant part of the alleged torts took place in the U.S.,

and caused damage and injury within the U.S.  And, as has been amply allege, Defendants were

responsible for those tortious acts and damages.  Defendants may take no safe harbor in the FSIA's

discretionary function exception.

The FSIA's discretionary function exception is modeled after a similarly-worded exception

in the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a). *See* H.R. Rep. 94-1487, at 21 (1976),

as reprinted in 1976 U.S.C.C.A.N. 6604, 6620. *See also Usoyan v. Republic of Turkey*, 6 F.4th 31,

38 (D.C. Cir. 2021). Courts consider what the Supreme Court has said about the FTCA's analogous

provision. *See MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921–22 (D.C.

Cir. 1987) (FTCA precedent provides "guidance" in FSIA cases); *Usoyan*, 6 F.4th at 38 (same).

The Supreme Court has said that the FTCA's discretionary function exception applies—

and sovereign immunity is preserved—if two conditions are met. First, there must be no "federal

14

statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *Usoyan*, 6 F.4th at 38; *see also United States v. Gaubert*, 499 U.S. 315, 322 (1991). Second, the agent's exercise of discretion must be "the kind that the discretionary function exception was designed to shield"—that is, "based on considerations of public policy." *Berkovitz*, 486 U.S. at 536–37; *Usoyan*, 6 F.4th at 38; *see also Gaubert*, 499 U.S. at 322–23. Because "the exception is designed to prevent 'judicial second guessing' of decisions 'grounded in social, economic, and political policy,'" the exception "protects only governmental actions and decisions based on considerations of public policy." *Swafford v. United States*, 839 F.3d 1365, 1370 (11th Cir. 2016) (quoting *Berkovitz*, 486 U.S. at 536–37).

Here, neither of the *Berkovitz* conditions are satisfied by Defendants, and thus Defendants cannot carry their burden of proving nonapplicability of the tortious conduct exception in this case.

### 1. Defendants' policies left no room for independent judgment.

Under *Berkovitz*, courts first determine whether the challenged conduct "involves an element of judgment or choice." 486 U.S. at 536; *Usoyan*, 6 F.4th at 38. An action is not discretionary if an employee is "bound to act in a particular way." *Gaubert*, 499 U.S. at 329; *Usoyan*, 6 F.4th at 38. If a governing law or policy "mandates particular conduct" and the employee violates the mandate, "there will be no shelter from liability because there is no room for choice." *Gaubert*, 499 U.S. at 324; *Usoyan*, 6 F.4th at 38–39. In essence, *Berkovitz*'s first condition asks whether the challenged conduct is rightfully the product of independent judgment. *See Berkovitz*, 486 U.S. at 536 (citing *Westfall v. Erwin*, 484 U.S. 292, 296–97 (1988)); *Usoyan*, 6 F.4th at 39. As alleged in the FAC, Defendants' agents and representatives in China and United States were bound to act as Defendants dictated and mandated them to act.  This is referenced in the FAC by the existence of the Military-Civil Fusion (MCF).  (*See* FAC ¶¶ 146–147).  The MCF

represents a "duty that transcends their personal and civilian identities."[4]  The existence of the MCF means that Chinese citizens and ex-pats, no matter what, will put China first, or face breaking one of the PRC's most supreme laws and the CCP's dictates.

The scheme to corner the market on masks and PPE was an absolute mandate by Defendants and its agents and representatives had no independent judgment as to the buying up of the PPE and shipping it back to China.

**2.     Defendants cannot prove the discretionary function exception was designed to shield their acts.**

The FSIA, like the FTCA, does not shield all exercises of discretion. Under *Berkovitz*, the discretionary function exception "protects only governmental actions and decisions based on considerations of public policy." *Berkovitz*, 486 U.S. at 537; *Usoyan*, 6 F.4th at 45. Mere "garden-variety" discretion receives no protection. *Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995); *Usoyan*, 6 F.4th at 45. Only discretionary actions "grounded in social, economic, and political policy" fall within the exception. *Gaubert*, 499 U.S. at 323; *Usoyan*, 6 F.4th at 45. *See also Red Lake Band of Chippewa Indians v. United States,* 800 F.2d 1187, 1195–96 (D.C. Cir. 1986). "Grounded in" does not mean "motivated by." Courts focus "not on the agent's subjective intent" but rather "on the nature of the actions taken." *Gaubert*, 499 U.S. at 325; *Usoyan*, 6 F.4th at 45.

Determining which discretionary actions qualify is "admittedly difficult"—after all, "nearly every government action is, at least to some extent, subject to 'policy analysis.'" *Cope*, 45 F.3d at 448; *Usoyan*, 6 F.4th at 45. But courts have resisted invitations to shield actions implicating only "the faintest hint of policy concern[ ]." *Cope*, 45 F.3d at 449; *Usoyan*, 6 F.4th at 45. Moreover, blatantly careless or malicious conduct cannot be recast in the language of cost-benefit analysis.

---

[4]  F. Scott Kieff, *Business, Risk, & China's MCF: Modest Tools of Financial Regulation for a Time of Great Power Competition*, Geo. Wash. L. Rev. (Vol. 88, Dec. 2020), available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3615846.

*Berkovitz*'s second condition is met "only where the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency." *Cope*, 45 F.3d at 450 (internal quotations omitted); *Usoyan*, 6 F.4th at 45.

Defendants' acts are not shielded here because market manipulation does not involve policy analysis, social wisdom, political practicability, or economic expediency. To the contrary, Defendants' acts of garden-variety market manipulation lack any identifiable public policy consideration. The FSIA (like the FTCA) does not shield Defendants' acts taken as market participants, to manipulate the market for masks and PPE (after having caused pandemic that gave rise to the urgent need for masks and PPE); or to corner that market by hoarding masks and PPE to the detriment of Plaintiffs, who suffered death, infection, and other emotional and physical harm as a result of Defendants' acts. (*See* FAC ¶¶ 24, 26, 53, 141, 154, 155). On this record, Defendants cannot sustain their burden of establishing the existence of *Berkovitz*'s second condition, and sovereign immunity does not exist.

Accordingly, the tortious conduct exception affords a separate and independent basis for the exercise of jurisdiction over Defendants based on their acts as alleged in the FAC.[5]

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that the Court find that exceptions to sovereign immunity under the FSIA exist here and do not shield the PRC or the CCP from subject matter jurisdiction under the FSIA; and for such other relief as the Court deems just and proper.

---

[5] Moreover, the discretionary acts safe harbor does not apply because "there is no discretion to commit, or to have one's officers or agents commit, an illegal act," all the more so where the act concerned is "clearly contrary to the precepts of humanity as recognized in both national and international law." *Letelier v. Rep. of* Chile, 488 F. Supp. 665, 673 (D.D.C., 1980). Defendants' actions in concealing a dangerous pathogen and allowing it to flourish, all the while cornering the market on the PPE so desperately needed by Plaintiffs, is clearly contrary to the precepts of humanity.

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(a)(3)**

Prior to filing this Motion and pursuant to this Court's Local Rules, counsel for Plaintiffs has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and Defendant PetroChina America has advised it opposes the relief sought herein,

Respectfully submitted this 7th day of December, 2023.

**THE LAW OFFICES OF**
**BERMAN & BERMAN, P.A.**
P.O. Box 272789
Boca Raton, FL 33427
Telephone: (561) 826-5200
Fax: (561) 826-5201

By:  */s Matthew T. Moore*
Matthew T. Moore, Esq.
Fla. Bar No. 70034
Primary: service@thebermanlawgroup.com
Secondary: mmoore@thebermanlawgroup.com

Case No. 20-CV-80604-RKA

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA
*MORIAH AHARON, et al. v. COMMUNIST PARTY OF CHINA, et al.*
CASE NO. 9:20-cv-80604-RKA

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed this December 7, 2023 using the CM/ECF system which will send a notice of electronic filing to all counsel or parties of record on the service list, including the following attorneys of record.

*/s/ Matthew T. Moore*
Matthew T. Moore, Esq.

*Counsel for Plaintiffs*

Matthew T. Moore
mmoore@thebermanlawgroup.com

The Law Offices of
Berman & Berman, P.A.
P.O. Box 272789
Boca Raton, FL 33427
Telephone: (561) 826-5200
Fax: (561) 826-5201

*Counsel for PetroChina International (America), Inc.*

Edward Soto
edward.soto@weil.com
Pravin R. Patel
pravin.patel@weil.com

Weil Gotshal & Manges
1395 Brickell Avenue
Suite 1200
Miami, FL 33131
305-577-3177
Fax: 374-7159