## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MORIAH AHARON, et al.,

               Plaintiffs,

    vs.

CHINESE COMMUNIST PARTY, et al.,

               Defendants.

Civil Action No. 9:20-cv-80604-RKA

**PETROCHINA'S RESPONSE TO PLAINTIFFS' MOTION FOR THE COURT TO FIND SUBJECT MATTER JURISDICTION UNDER THE F.S.I.A. FOR THE PURPOSES OF DEFAULT FINAL JUDGMENT**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................... 1

PROCEDURAL BACKGROUND................................................................................. 2

FACTUAL BACKGROUND ....................................................................................... 3

I.      Countries Around the World Struggle to Control COVID-19 and Its Effects................... 3

II.     Plaintiffs Allege a Grand Conspiracy to Conceal the Origins and Effects of
        COVID-19................................................................................................... 4

ARGUMENT ........................................................................................................ 6

I.      The Court Does Not Have Personal Jurisdiction Over PetroChina. ................................ 6

II.     The PRC and the CCP Are Immune from Suit. ................................................... 6

        A.      The Commercial Activity Exception Is Inapplicable Because Plaintiffs'
                Claims Are Not Based Upon or in Connection with Commercial Activity
                that Had a Direct Effect in the United States. ........................................ 7

                1.      Plaintiffs' Claims Are Based on the PRC's and the CCP's
                        Responses to the COVID-19 Virus, Which Is Noncommercial
                        Activity. ................................................................................. 8

                2.      Plaintiffs' Claims Are Not in Connection with Commercial
                        Activity Because They Arose in the Context of the PRC's and the
                        CCP's Response to a Global Pandemic. .................................... 11

                3.      Due to Countless Intervening Factors, the Alleged Acts of the PRC
                        and the CCP Could Not Have Caused a Direct Effect in the United
                        States. .............................................................................. 15

        B.      The Noncommercial Tort Exception Does Not Apply Because the Alleged
                Misconduct Occurred Abroad and the First Exception to the
                Noncommercial Tort Exception Applies. ............................................ 18

CONCLUSION.................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989)..................................................................................................18, 19

*Missouri ex rel. Bailey v. People's Republic of China*,
2024 WL 106115 (8th Cir. Jan. 10, 2024) ..............................................................13, 14, 19

*Beg v. Islamic Republic of Pak.*,
353 F.3d 1323 (11th Cir. 2003) ...........................................................................8

*Chisholm & Co. v. Bank of Jamaica*,
643 F. Supp. 1393 (S.D. Fla. 1986) .....................................................................14

*Cicippio v. Islamic Republic of Iran*,
30 F.3d 164 (D.C. Cir. 1994)...............................................................................12, 13

*De Csepel v. Republic of Hung.*,
714 F.3d 591 (D.D.C 2013) .................................................................................17

*Devengoechea v. Bolivarian Republic of Venezuela*,
889 F.3d 1213 (11th Cir. 2018) ...........................................................................8, 11

*Eisenberg v. People's Republic of China*,
2022 WL 1591541 (D. Mass. May 19, 2022) ........................................................9

*Exxon Corp. v. C.I.R.*,
T.C. Memo. 1993-616, 1993 WL 534017 (U.S. Tax. Ct. Dec. 22, 1993) ........................12, 14

*Fagot Rodriguez v. Republic of Costa Rica*,
139 F. Supp. 2d 173 (D.P.R. 2001).......................................................................10

*Fagot Rodriguez v. Republic of Costa Rica*,
297 F.3d 1 (1st Cir. 2002)....................................................................................19

*Garb v. Republic of Poland*,
440 F.3d 579 (2d Cir. 2006).................................................................................11

*Guevara v. Republic of Peru*,
608 F.3d 1297 (11th Cir. 2010) ...........................................................................11, 15, 16, 18

*Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*,
43 F.4th 1303 (11th Cir. 2022) ............................................................................6

*Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*,
  129 F.3d 543 (11th Cir. 1997) ...................................................................11

*MOL, Inc. v. Peoples Republic of Bangladesh*,
  736 F.2d 1326 (9th Cir. 1984) ...................................................................14

*OBB Personenverkehr AG v. Sachs*,
  577 U.S. 27 (2015) ...........................................................................8, 9, 10

*Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*,
  657 F.3d 1159 (11th Cir. 2011) ..............................................................12, 13

*Republic of Argentina v. Weltover Inc.*,
  504 U.S. 607 (1992) .......................................................................11, 15, 17

*Salinero v. Johnson & Johnson*,
  400 F. Supp. 3d 1334 (S.D. Fla. 2019), *aff'd*, 995 F.3d 959 (11th Cir. 2021).........................19

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993) ............................................................................6, 8

*Sequeira v. Republic of Nicaragua*,
  815 F. App'x 345 (11th Cir. 2020) ........................................................7, 12, 14

*United States v. Gaubert*,
  499 U.S. 315 (1991) ..............................................................................19

*United States v. Lee*,
  106 U.S. 196 (1882) ...............................................................................6

*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*,
  33 F.3d 1232 (10th Cir. 1994) ...................................................................16

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983) .........................................................................6, 7, 15

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ...............................................................................6

**Statutes**

28 U.S.C. § 1603(d) ...............................................................................8

28 U.S.C. § 1605(a)(2)..........................................................................8, 15

28 U.S.C. § 1605(a)(5)...........................................................................18

28 U.S.C. § 1605(a)(5)(A) ....................................................................18, 19

**Other Authorities**

Annelies Wilder-Smith et al., *Can We Contain the COVID-19 Outbreak with the Same Measures as for SARS?*, LANCET INFECT. DIS. e102 (May 2020)....................................3

CDC Museum of COVID-19 Timeline, *available at* https://www.cdc.gov/museum/timeline/covid19.html ............................................................14

Christopher Vannabouathong et al., *Novel Coronavirus COVID-19*, J. BONE JOINT SURG. AM. 734, 740 (May 6, 2020) .........................................................................................3

Directorate for Financial and Enterprise Affairs Competition Committee, The Role of Competition Policy in Promoting Economic Recovery – Note by the United States, OECD, at 2 (Dec. 2, 2020), *available at* https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competitio-fora/economic_recovery_us.pdf ................................9

Edouard Mathieu et al., Policy Responses to the Coronavirus Pandemic, *Our World in Data* (2020), *available at* https://ourworldindata.org/policy-responses-covid........................................................................................................................3, 4

Jennifer Peltz, *States trash Masks and Pandemic Gear as Huge Stockpiles Linger and Expire*, PBS (Dec. 20, 2023).........................................................................................14, 17

Michelle Toh, *'It's Crazy': Panic Buying Forces Stores to Limit Purchases of Toilet Paper and Masks*, CNN (Mar. 6, 2020) ........................................................................17

Price Gouging Prevention Act, H.R. 6472, 116th Cong. (2020) .....................................................17

## PRELIMINARY STATEMENT

COVID-19 turned the world on its head. It spread rapidly from person to person making it virtually impossible to contain. Its effects were deadly, especially among vulnerable populations. Governments around the world implemented vastly different strategies as they struggled to combat the spread of the virus and to protect their citizens. Despite the world's unprecedented efforts, people continue to contract COVID-19 to this day.

Plaintiffs challenge how the People's Republic of China (the "**PRC**") and the Communist Party of China (the "**CCP**," and together with the PRC, the "**Foreign Defendants**") responded to the COVID-19 pandemic in the instant lawsuit filed thousands of miles away from where any of the material allegations occurred. They allege that the PRC and the CCP, created, failed to contain, and subsequently misrepresented the transmissibility and effects of the COVID-19 virus. As part of this "scheme," Plaintiffs allege that the PRC and the CCP hoarded personal protective equipment ("**PPE**") for economic and political gain. But the PRC's and the CCP's policy judgments and actions in response to an unprecedented health crisis within their own borders are the very definition of sovereign activity. Well-settled principles of sovereign immunity, codified in the Foreign Sovereign Immunities Act ("**FSIA**"), make clear that sovereigns cannot be subject to suit in foreign countries for such conduct. Indeed, it would be truly shocking to foreign relations law if the United States and the CDC were subject to suit in China for the handling of the COVID-19 pandemic in the United States. Reciprocally, it is not within the province of United States courts to second-guess the PRC's or the CCP's handling of the COVID-19 virus and efforts to protect their own citizens. Yet, that is exactly what Plaintiffs ask this Court to do.

Plaintiffs ignore the governmental nature of the conduct alleged in the Amended Complaint and instead claim that the PRC's and the CCP's alleged misconduct falls within the commercial activity exception of the FSIA, narrowly focusing on a subset of allegations relating to market manipulation and PPE hoarding. What Plaintiffs fail to appreciate is that without the alleged grand conspiracy surrounding the PRC's and the CCP's response to the COVID-19 pandemic, all that remains is a claim that the PRC and the CCP allegedly hoarded PPE. However, hoarding PPE,

even if true (it is nothing more than an unsupported allegation), in and of itself, is not actionable conduct. The alleged COVID-19 conspiracy, which involves sovereign and not commercial activity, is the core of Plaintiffs' claims. Without it, Plaintiffs would not have suffered their alleged harm. But even if Plaintiffs' claims were based upon commercial activity (they are not), the PRC's and the CCP's alleged actions could not have caused a *direct effect* in the United States because there were countless intervening events, such as the decision of infected individuals to travel to the United States, the panic buying of PPE, states hoarding PPE, and other factors that led to COVID-19 reaching the United States.

The FSIA's noncommercial tort exception does not save Plaintiffs' claims either. Nearly all of the alleged misconduct occurred abroad, not in the United States. This alone renders the exception inapplicable. Even if the exception were applicable, the first exception to the noncommercial tort exception preserves the Foreign Defendants' immunity from suit because Plaintiffs' allegations reflect a matter of discretion, as they involve matters of social, economic, and political policy; namely how the Foreign Defendants responded to a novel virus within their borders.

Therefore, the Court should find that it does not have subject matter jurisdiction over the claims against the PRC and the CCP under the FSIA and deny Plaintiffs' Motion[1] in full.

## PROCEDURAL BACKGROUND

The Motion is currently before the Court in connection with Plaintiffs' request for default judgment against the PRC and the CCP. The Motion does not directly implicate Defendant Petro-China. However, based on the current allegations in the First Amended Class Action Complaint [ECF No. 19] (the "**Amended Complaint**"), and statements made by counsel for Plaintiffs at recent hearings before the Court,[2] if the Court finds that it lacks subject matter jurisdiction over the

---

[1] Plaintiffs' Motion for the Court to Find Subject Matter Jurisdiction under the F.S.I.A. for the Purposes of Default Final Judgment (the "**Motion**") [ECF No. 116].

[2] Sept. 20, 2023 Hr'g Tr. 6:7–10 ("I don't think that the case can proceed without the PRC and the CCP. They are a vital part of our allegations and what we believe happened that caused the pandemic – or caused the issue of hoarding the PPE."), 7:8–17 ("THE COURT: All right. Now, you

CCP and the PRC and dismisses the claims against them, it will be case dipositive for PetroChina as well.

## FACTUAL BACKGROUND

I.      **Countries Around the World Struggle to Control COVID-19 and Its Effects.**

The COVID-19 virus was a novel coronavirus that triggered one of the most impactful pandemics in modern history. Christopher Vannabouathong et al., *Novel Coronavirus COVID-19*, 102(9) J. BONE JOINT SURG. AM. 734, 740 (May 6, 2020). Despite vigilant and focused attempts to contain the outbreak of the virus to Wuhan, China after the sentinel case was reported in December 2019, the nature of the virus made it impossible to contain or accurately predict its trajectory. Annelies Wilder-Smith et al., *Can We Contain the COVID-19 Outbreak with the Same Measures as for SARS?*, 20(5) LANCET INFECT. DIS. e102, e102-03 (May 2020). It was a fluid situation because of the rapidly evolving nature of the virus. Vannabouathong, *supra*, at 741. Government, health, medical, and other professionals and personnel around the world were working around the clock to better understand the unprecedented situation and come up with solutions. Edouard Mathieu et al., Policy Responses to the Coronavirus Pandemic, *Our World in Data* (2020), *available at* https://ourworldindata.org/policy-responses-covid. Despite these efforts, by March 2020, the World Health Organization (the "**WHO**") declared COVID-19 a worldwide pandemic. Vannabouathong, *supra*, at 734.

Given the uncertainty and novel nature of the virus from a medical and health perspective, and different governmental views on things such as economic and social policy, governments

---

mentioned earlier that the case doesn't really make sense without these defendants. Am I understanding what you said correctly? MR. MOORE: Yes, sir. THE COURT: Okay. So to your mind, it doesn't make sense to proceed against the defendant who's here, unless I am going to make a finding that these other defendants were properly served and are properly here as well. Is that correct? MR. MOORE: Yes, sir."); Oct. 20, 2023 Hr'g Tr. 6:22–24 ("[T]he allegations of the complaint are intertwined between the China-based defendants and PetroChina . . . .").

around the world responded differently to the virus. Mathieu, et al., *supra* (detailing various responses and restrictions implemented by different countries). For example, schools and workplaces were closed in some countries and open in others. *Id.* (comparing school closures around the world). International and domestic travel restrictions, public gathering rules, face covering requirements, vaccination policies, testing, and contact tracing varied by country. *Id.* Moreover, there were sub-national and regional differences that further accentuated rule and policy variances. *Id.* Underpinning these variances is the fact that no country, state, city, or governmental body had the proverbial "silver bullet" to combating the COVID-19 pandemic. *Id.* Different governmental bodies implemented vastly different measures based on a variety of factors, including data, ideology, population, and much more. *Id.* Containment was key for some, while "business as usual" was key for others. *Id.* There was no "right" or "wrong" approach, and governmental responses were based on what any particular governmental body thought was best for its people. *Id.*

## II.     Plaintiffs Allege a Grand Conspiracy to Conceal the Origins and Effects of COVID-19.

The allegations in the Amended Complaint center on how the PRC and the CCP allegedly mishandled the COVID-19 virus. Plaintiffs dedicate the overwhelming majority of their General Allegations in the Amended Complaint to the origins of COVID as part of gain-of-function research commissioned by the Chinese government in connection with its alleged "bio-weapons research," and alleged subsequent cover-up of the virus. *Id.* ¶¶ 31-123. Plaintiffs allege that the virus was either intentionally released from a lab in Wuhan, escaped through infected lab employees, or escaped through animals used in the lab and subsequently sold in Wuhan animal markets. *Id.* ¶ 41. All the while, Plaintiffs allege that the PRC and the CCP were aware of the dangers of the COVID-19 virus and the extent of its transmissibility. *Id.* ¶¶ 54-65. Plaintiffs allege that, despite this knowledge, Chinese officials continually misled the world about the origin of the virus, the extent of COVID-19 cases, the virus's transmissibility, and the effects of the virus. *Id.* ¶¶ 72-100. The first pages of the Motion similarly detail the outbreak of COVID-19, its release, and the alleged subsequent cover-up. Mot. at 4-5.

"Against this backdrop," Plaintiffs allege a grand scheme implemented with tremendous foresight by the PRC and the CCP to take advantage of the COVID-19 pandemic by hoarding and stockpiling PPE. *Id.* at 5.[3] Interestingly, Plaintiffs allege that "the CCP and the PRC used the pandemic and their stranglehold on the mask market" not only for alleged economic gain, but also "to curry political favor around the world as they try to unseat the United States as the leading superpower." Am. Compl. ¶153. Plaintiffs spend a significant amount of time discussing the effects COVID-19 had on the United States and how it was transmitted. *Id.* ¶125-132. They do not discuss how it was a *global* virus, or any of the impacts it had on China, much less how the PRC and the CCP needed PPE to protect Chinese citizens, who number in the billions.

The only damages Plaintiffs plead in any "detail" relate to contracting or fear of contracting COVID-19. Nearly all of their claims, most notably toxic battery, relate to such harm. *Id.* ¶¶ 178–181. While Plaintiffs state in a conclusory fashion that they have suffered "economic harms," (*id.* ¶¶ 175, 186, 191, 197) they never substantiate such harm.[4] The only specific harm alleged is general "death, infections, and other physical and emotional harms"—all the injuries caused by the global COVID-19 virus. *Id.* ¶155.

---

[3] Plaintiffs bring PetroChina into the lawsuit in two—of two-hundred and twenty-six—paragraphs (*id.* ¶¶ 147, 154) where they allege that PetroChina was one of the many companies the PRC and the CCP allegedly enlisted to help hoard PPE in the United States. *Id.* ¶154. Specifically, they allege that PetroChina employees went to Home Depot and Lowe's in Houston, Texas (though Plaintiffs fail to specifically identify which stores) to purchase masks, and that somehow this harmed Plaintiffs—none of whom are residents of Texas. *Id.* ¶¶ 7–15, 147.

[4] While Plaintiffs generally allege that "[w]hen PPE is available, it is at highly inflated prices over market rates before the pandemic" (*id.* ¶ 133), they never tie this allegation to any Plaintiff.

<u>**ARGUMENT**</u>

**I.      The Court Does Not Have Personal Jurisdiction Over PetroChina.**

This Court ordered briefing "*only* on the question of subject matter jurisdiction under the [FSIA]." Order on Default Final Judgment Procedure [ECF No. 112] (emphasis in original). Therefore, by filing this Response, PetroChina in no way waives any jurisdictional arguments or defenses it has to this action, including that this Court lacks personal jurisdiction over it.

However, in an abundance of caution, PetroChina states that the Court does not have personal jurisdiction over it. Plaintiffs allege that PetroChina went to stores in Houston, Texas to purchase PPE and export it back to China (an allegation which PetroChina disputes). Am. Compl. ¶ 147. There is no allegation that PetroChina had any "minimum contacts" with Florida or its residents, or purposefully availed itself to any benefit in Florida, because it did not. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). The only allegation is that the effects of PetroChina's alleged actions were felt in Florida, which is insufficient to establish personal jurisdiction under Eleventh Circuit case law. Am. Compl. ¶ 154; *Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1311 (11th Cir. 2022).

 Nor would it be fair to burden PetroChina with a lawsuit in Florida based on alleged acts in Texas that were for the alleged benefit of a foreign nation. *World-Wide Volkswagen Corp.*, 444 U.S. at 292 ("[M]aintenance of the suit [must] not offend traditional notions of fair play and substantial justice.") (citation and internal quotation marks omitted).

**II.     The PRC and the CCP Are Immune from Suit.**

As Plaintiffs correctly note, the PRC and the CCP are "presumptively immune from the jurisdiction of United States courts . . . ." Mot. at 6 (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)). While sovereign immunity over foreign states[5] is currently governed by statute, the concept of sovereign immunity dates back to English common law and is rooted in concepts of

---

[5] It is undisputed that both the PRC and the CCP are foreign states as the term is defined under the FSIA. Mot. at 3 n.2; Pls.' Mot. to Find that Service Has Been Effectuated at 4 [ECF No. 101].

"grace and comity." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983); *see United States v. Lee*, 106 U.S. 196, 205 (1882).

The FSIA codifies the "restrictive theory" of sovereign immunity. *Verlinden*, 461 U.S. at 488. This standard imposes on "a plaintiff who seeks to sue a foreign state" the "burden" of "'producing evidence' that one of the FSIA's [] exceptions applies." *Sequeira v. Republic of Nicaragua*, 815 F. App'x 345, 348–49 (11th Cir. 2020) (quoting *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1312–13 (11th Cir. 2009)). Here, Plaintiffs argue that the commercial activity and noncommercial tort exception apply and provide this Court with subject matter jurisdiction over their claims against the PRC and the CCP. Mot. at 7.

Even taking the facts in the Amended Complaint as true,[6] Plaintiffs have failed to demonstrate that the commercial activity or the noncommercial tort exception applies, and therefore, this Court does not have jurisdiction over Plaintiffs' claims against the PRC or the CCP.

A.  The Commercial Activity Exception Is Inapplicable Because Plaintiffs' Claims Are Not Based Upon or in Connection with Commercial Activity that Had a Direct Effect in the United States.

The commercial activity exception to sovereign immunity provides jurisdiction when the action is based upon: (1) "commercial activity carried on in the United States by the foreign state"; (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) "upon an act outside the territory of the United States in connection with

---

[6] Plaintiffs attach three exhibits to the Motion in support of their arguments that subject matter jurisdiction exists. All are in Chinese and unaccompanied by certified translations. Composite Exhibit A has no translation at all and therefore should not be considered. The two translated exhibits do not mention the PRC or the CCP, and do not prove Plaintiffs' arguments. Exhibit B purports to be a letter from the dean of the Wuhan Institute of Virology ("**WIV**") telling staff not to share "testing and experimental data[,] results, [or] conclusions." Am. Compl. Ex. B. It does not prove that the PRC and the CCP were spreading false information about COVID-19. If anything, it shows that the WIV (which is not the PRC or the CCP) was actively trying to prevent "false information" from being spread. Am. Compl. Ex B. Exhibit C purports to be a warning letter from the Wuhan Police Department issued to a doctor telling him to stop spreading "untruthful information," but does not specify what the information was. *Id.* Ex. C. Again, this exhibit shows only that the Wuhan Police Department was trying to stop false information from being spread.

7

a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Plaintiffs argue that the third clause of the commercial activity exception applies because "[t]he Defendants' scheme was principally abroad." Mot. at 7. To fall within the third clause: "1) the lawsuit must be based upon an act that took place outside the territory of the United States; 2) the act must have been taken in connection with a commercial activity[;] and 3) the act must have caused a direct effect in the United States." *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1224 (11th Cir. 2018) (citation omitted).

The FSIA defines commercial activity as "[e]ither a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). While the FSIA does not define "commercial," case law defines commercial activity as activity involving commerce or trade that private actors engage in. *See Beg v. Islamic Republic of Pak.*, 353 F.3d 1323, 1325 (11th Cir. 2003) (citation omitted). A foreign sovereign engages in commercial activity when it acts "not as regulator of a market, but in the manner of a private player within it[.]" *Id.* (citation omitted). Acts involving "trade and traffic or commerce" are commercial acts. *Id.* (citation omitted). By contrast, "a government's regulation of the market, use of police power, or other activities requiring state authority are not commercial." *Id.* (citation omitted).

### 1. *Plaintiffs' Claims Are Based on the PRC's and the CCP's Responses to the COVID-19 Virus, Which Is Noncommercial Activity.*

Plaintiffs' claims are not based upon commercial activity. To determine whether a plaintiff's claims are "based upon" commercial activity, the court must look to the "core" of the suit, i.e., the gravamen of the complaint. *See OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015); *Nelson*, 507 U.S. at 357–358. The Court must consider the acts that "actually injured [Plaintiffs]." *OBB*, 577 U.S. at 35.

The gravamen of Plaintiffs' claims is the alleged failure to contain the COVID-19 virus and subsequent misrepresentations regarding its effects and transmissibility. Plaintiffs allege that "the CCP and the PRC knew that COVID-19 was dangerous and capable of causing a pandemic, yet deceived the world about its dangers, actively concealed it until it was too late, and failed to

contain it when they could have . . . ." Am. Compl. ¶ 3. The PRC and the CCP then allegedly hoarded and stockpiled PPE while concealing the truth about the virus for economic and political gain. *Id.* ¶¶ 168-226.

While the Motion focuses on the alleged hoarding of PPE and market manipulation (Mot. at 10), that activity cannot lie at the core of their suit, no matter how Plaintiffs try to disguise the nature of their claims. Plaintiffs do not allege that the PPE hoarding in and of itself caused their alleged injuries. Nor could they. Hoarding, itself, even if supported by some evidence (there is none here and Plaintiffs have offered none), is not actionable.[7] Rather, Plaintiffs allege that the PPE hoarding caused their alleged harm because it led to an increased risk of contracting COVID-19. *Id.* ¶¶ 7-16 (detailing Plaintiffs' injuries as contraction or fear of contraction of COVID-19). Therefore, without the COVID-19 virus, Plaintiffs would have suffered no injury. In fact, Plaintiffs acknowledge this point when they allege that the handling of the COVID-19 virus abroad, a sovereign act, is what caused 95% of COVID-19 infections in the United States. *Id.* ¶ 123 (alleging that "95% of infections could have been prevented" had the PRC and the CCP properly responded to the COVID-19 virus). Simply put, without the alleged mishandling of the pandemic, Plaintiffs could not have suffered any injury. *Cf. OBB*, 577 U.S. at 35–36 ("[T]here is nothing wrongful about the sale of the Eurail pass standing alone. Without the existence of the unsafe boarding conditions in Innsbruck, there would have been nothing to warn Sachs about when she bought the Eurail pass. However Sachs frames her suit, the incident in Innsbruck remains at its foundation."). What lies at the core of all of Plaintiffs' claims is the handling of a global pandemic, which is sovereign activity. *Eisenberg v. People's Republic of China*, 2022 WL 1591541, at *5 (D. Mass. May 19, 2022) ("Eisenberg's allegations that PRC government officials engineered COVID-19,

---

[7] Indeed, a joint note by the Antitrust Division of the Department of Justice and the U.S. Federal Trade Commission relating to COVID-19 hoarding around the country acknowledges that "hoarding and exploitation are not themselves antitrust violations." Directorate for Financial and Enterprise Affairs Competition Committee, The Role of Competition Policy in Promoting Economic Recovery – Note by the United States, OECD, at 2 (Dec. 2, 2020), *available at* https://www.ftc.gov/system/files/attachments/us-submissions-oecd-2010-present-other-international-competitio-fora/economic_recovery_us.pdf.

decided to conceal information concerning its escape from a lab, and failed to prevent the spread of the virus by, among other things, permitting international air travel is not subject to the commercial activity or noncommercial tortious activity exceptions to the FSIA.").

As many courts have noted, "artful pleading" or "verbal swordplay is to no avail" when determining whether conduct is commercial or sovereign. *See, e.g.*, *OBB*, 577 U.S. at 36; *Fagot Rodriguez v. Republic of Costa Rica*, 139 F. Supp. 2d 173, 188 (D.P.R. 2001). In *Fagot Rodriguez*, defendants were the Consul and Vice Consul of the Republic of Costa Rica and rented land in Puerto Rico from plaintiff, which they operated as a consulate. *Id.* at 178. They breached the lease, but remained on the property, and plaintiffs sued for breach of the lease and trespass. *Id*. The court analyzed whether the defendants were immune from suit under the FSIA or whether several exceptions, including the commercial activity exception, applied. *Id.* at 187–95. The court stated:

> Defendants prefer a higher level of abstraction, proclaiming that the refusal of consuls to vacate the premises implemented or executed the lofty and uniquely sovereign decision to foster, through a diplomatic mission, the cultural and economic ties between the Commonwealth of Puerto Rico and the Republic of Costa Rica. Plaintiffs would rather dig into the trenches, describing a rather colorful picture of Defendants' trespass and resulting harm as mere tardiness, cheapness, refusal to pay the bill . . . . Under FSIA jurisprudence, this verbal swordplay is to no avail.

*Id.* at 188. The Court noted that the plaintiffs' parsing of the claim as one for a simple breach of lease and trespass went too far. *Id.* at 193. "[T]here is no logical limit (other than semantic creativity), to the Court's ability to further parse the activities underlying the claim and thus strip them of their sovereign character." *Id.* at 192–93. "[But] this Court cannot ignore the fact that the offending intruders were a consular mission and their fully accredited diplomatic officers, exercising their diplomatic discretion in their official capacity." *Id.* at 193–94. Likewise, while Plaintiffs try to focus their claim as one of market manipulation and hoarding, the Court cannot ignore that even by Plaintiffs' account, the PRC and the CCP were responding to a global pandemic.

The cases cited by Plaintiffs in support of their argument that the PRC's and the CCP's response to the COVID-19 pandemic was based on or in connection with commercial activity (Mot. at 10) are inapposite because they all concern alleged breaches of contract that created harm

untied to the underlying sovereign acts. *See Honduras Aircraft Registry, Ltd. v. Gov't of Honduras*, 129 F.3d 543, 548–49 (11th Cir. 1997) (breach of a contract between Honduras and a private party to assist with the inspection and certification of aircraft for airworthiness); *Guevara v. Republic of Peru*, 608 F.3d 1297, 1301 (11th Cir. 2010) (breach of contract for the failure of the Peruvian government to pay the reward it offered for information leading to the capture of a fugitive); *Republic of Argentina v. Weltover Inc.*, 504 U.S. 607, 611 (1992) (breach of contract by Argentina in failing to pay bondholders on a certain date); *Devengoechea*, 889 F.3d at 1216, 1221–22 (breach of contract by Venezuela for failing to pay for a collection of General Simón Bolívar). Unlike these breach of contract cases, the alleged hoarding of PPE to deploy for Chinese citizens—the alleged commercial act here—could not create any actionable injury to Plaintiffs but for the alleged conspiracy by the PRC and the CCP to conceal and fail to maintain the COVID-19 virus—a purely sovereign act.

>    2.    *Plaintiffs' Claims Are Not in Connection with Commercial Activity Because They Arose in the Context of the PRC's and the CCP's Response to a Global Pandemic.*

The phrase "in connection with" must be interpreted narrowly and in accordance with Congress' intention that the exception embrace only "commercial conduct." *E.g.*, *Garb v. Republic of Poland*, 440 F.3d 579, 587 (2d Cir. 2006) (citing H.R. Rep. No. 94-1487, at 19 (1976)). "[A]cts are 'in connection' with . . . commercial activity [if] there is a 'substantive connection' or a 'causal link' between them and the commercial activity." *Id.*

The PRC's and the CCP's alleged actions were not taken in connection with commercial activity. To the extent the alleged PPE hoarding by the PRC and the CCP can be considered, the Eleventh Circuit and other courts have repeatedly emphasized that the Court should consider such purportedly commercial activity in the context in which it arose—here, a sovereign nation's handling of a pandemic. For example, in *Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1177–78 (11th Cir. 2011), the Eleventh Circuit concluded that Spain was

"acting like a sovereign" because although a ship it operated "did transport private cargo of Spanish citizens for a charge, the transport was of a sovereign nature . . . providing protection and safe passage to property of Spanish citizens[.]" As in *Odyssey*, the alleged hoarding of PPE by the PRC and the CCP was one of many alleged actions the PRC and the CCP took when they each were "acting like a sovereign" and responding to a global pandemic. *See id.* Therefore, the alleged PPE hoarding by the PRC and the CCP was not in the context of commercial activity.

Similarly, in *Sequeira v. Republic of Nicaragua*, 815 F. App'x at 351, Nicaragua allegedly took plaintiff's "farmland in Nicaragua and [sold] the livestock as meat products in the United States." While any individual acting as a commercial business could likewise acquire land and sell products, the Eleventh Circuit found that Nicaragua was immune from suit and that the commercial activity exception did not apply because the sale of the meat products arose from the taking of land, a sovereign act. *Id.* Here the alleged PPE hoarding likewise arose from the PRC's and the CCP's response to a global pandemic, which is sovereign activity.

Likewise, in *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168–69 (D.C. Cir. 1994),[8] the D.C. Circuit held that taking hostages and demanding the release of frozen funds in the United States was not a commercial activity. The D.C. Circuit looked to the context (not purpose) of the entire act to determine whether it was commercial. *Id.* at 168. It found that the context of the kidnappings was sovereign because it related to foreign relations: "[t]he United States government was acting purely as a sovereign regulator when it froze the assets of Iran and its citizens, and the government of Iran's alleged efforts to release the freeze were likewise peculiarly sovereign." *Id.* Like in *Cicippio*, the alleged acts of the PRC and the CCP were taken in connection with their response to the global pandemic, a purely sovereign act. It is irrelevant that Plaintiffs allege that the PRC's and the CCP's actions may have been profit driven, just as the D.C. Circuit in *Cicippio* found it irrelevant that the kidnappings were done for the purpose of unfreezing assets. *Id.* at 168

---

[8] While the *Cicippio* case was decided before the enactment of the terrorism exception of the FSIA, its analysis on the commercial activity exception has not been overturned.

("That money was allegedly sought . . . could not make an ordinary kidnapping a commercial act."); *accord Exxon Corp. v. C.I.R.*, T.C. Memo. 1993-616, 1993 WL 534017, at *53 (U.S. Tax. Ct. Dec. 22, 1993) ("[T]he Saudi power over the pricing of its crude was sovereign in nature[.]"). Because the PRC and the CCP took into account "non-marketplace considerations" when allegedly hoarding PPE, namely the protection of their citizens, they were not behaving "as businessmen" and therefore their actions could not have been taken in connection with commercial activity. *Cicippio*, 30 F.3d at 168–69.

The recent 2-1 decision by a panel of the Eighth Circuit in *Missouri ex rel. Bailey v. People's Republic of China*, 2024 WL 106115 (8th Cir. Jan. 10, 2024), does not warrant a different result. In fact, the non-binding opinion would not stand under binding precedent in this Circuit, such as *Odyssey* and *Sequeira*, because the court improperly separated the alleged hoarding from the alleged response to and handling of the COVID-19 pandemic, and failed to consider the overall context of the alleged PPE hoarding. Here, the alleged hoarding cannot be separated from the handling of the pandemic because without the alleged mishandling of the pandemic, Plaintiffs could not have suffered any harm. As noted above, Plaintiffs themselves allege that "95% of infections could have been prevented" had the PRC and the CCP properly responded to the COVID-19 virus. Am. Compl. ¶ 123. Likewise, the *Missouri* court ignored that the alleged PPE hoarding occurred in the context of the PRC's and the CCP's response to COVID-19. Like how transporting people and cargo was not commercial activity in *Odyssey* because it was in the context of the Spanish government "providing protection and safe passage to property of Spanish citizens," the alleged PPE hoarding was in the context of the PRC's and the CCP's response to a global pandemic. *Odyssey*, 657 F.3d at 1177–78.

Moreover, the *Missouri* court based its holding on the allegations in the operative complaint in that case. 2024 WL 106115 at *1. Particularly, it relied on the allegations that "defendants hoarded masks and then sold lower-quality equipment in the United States," and that "China [allegedly] 't[ook] over factories that ma[de] masks on behalf of American companies.'" *Id.* at *5. Again, as to the alleged hoarding of PPE, the *Missouri* court failed to consider that the alleged

mishandling of the COVID-19 pandemic, not the hoarding itself, is what actually caused the alleged injuries, a fact which the Amended Complaint in this case emphasizes. Am. Compl. ¶ 123. As to the allegations of taking over factories and restricting the export of PPE, that is not commercial activity under Eleventh Circuit precedent. The taking of property is a quintessential sovereign act. *Sequeira*, 815 F. App'x at 351 (commercial activity exception did not apply to Nicaragua's sale of meat products because it arose from the taking of land, a sovereign act); *Exxon Corp.*, 1993 WL 534017, at *54 ("[T]he subsequent takeover of Aramco by the SAG was another exercise of the SAG's sovereign power . . . ."). Likewise "[t]he regulation of imports and exports is a sovereign prerogative." *Chisholm & Co. v. Bank of Jamaica*, 643 F. Supp. 1393, 1401 (S.D. Fla. 1986); *MOL, Inc. v. Peoples Republic of Bangladesh*, 736 F.2d 1326, 1328–29 (9th Cir. 1984) (commercial activity exception did not apply to the breach of a government contract for the sale of monkeys because it involved a sovereign regulating its own export of its natural resources).[9]

Further, *Missouri* got it wrong. It removes immunity for the PRC and the CCP based on how they allegedly handled a global pandemic within their own borders. By this logic, the United States or the CDC could be subject to suit in foreign nations based on how they responded to COVID-19, or any other pandemic or global crisis. Indeed, as discussed below, several states "stockpiled" PPE in response to COVID-19. Jennifer Peltz, *States trash Masks and Pandemic Gear as Huge Stockpiles Linger and Expire*, PBS (Dec. 20, 2023). If the *Missouri* court's analysis were accepted, then presumably the states that stockpiled PPE here in the United States could be subject

---

[9] The *Missouri* court also discusses the alleged information asymmetry between China and the rest of the world that China allegedly used to its advantage. *Missouri*, 2024 WL 106115, at *5. But if one breaks down the timeline of events, it is clear that there was no information asymmetry. The Amended Complaint alleges that PPE hoarding began "between January 24th and February 29th." Amended Complaint ¶ 141. But, by January 31, 2020 the WHO had already put the world on notice of the severity of the COVID-19 virus by declaring it a "Public Health Emergency of International Concern." CDC Museum of COVID-19 Timeline, *available at* https://www.cdc.gov/museum/timeline/covid19.html. And, Plaintiffs even cite public articles from as early as February 7, 2020 detailing the deadly effects of COVID-19. Am. Compl. ¶ 147 n. 101 (citing a Bloomberg article from February 7, 2020). Throughout the entire period of alleged hoarding, the world was being put on notice about COVID-19 and its deadly effects; there was no information asymmetry.

to suits around the world for their alleged actions. Such an expansive application of the commercial activity exception goes far beyond the "restrictive theory" of sovereign immunity under the FSIA. *Verlinden*, 461 U.S. at 488.

Plaintiffs' claims are not based on or in connection with commercial activity. All of Plaintiffs' claims center on the PRC's and the CCP's response to a global pandemic. Without the alleged mishandling of the COVID-19 pandemic, Plaintiffs state there would be no harm. As such, the acts that allegedly injured Plaintiffs, responding to a global pandemic, are sovereign, not commercial activity. Even focusing on alleged PPE hoarding does not save Plaintiffs' claims because the alleged hoarding occurred in the context of the PRC's and the CCP's response to a global pandemic within their own boarders. As such the commercial activity exception does not apply.

3.      *Due to Countless Intervening Factors, the Alleged Acts of the PRC and the CCP Could Not Have Caused a Direct Effect in the United States.*

Furthermore, even if Plaintiffs' claims were based on or in connection with commercial activity, the alleged actions of the PRC and the CCP could not have caused a direct effect in the United States. To fall within the commercial activity exception, the alleged acts outside of the United States must have caused a "direct effect in the United States." 28 U.S.C. § 1605(a)(2). "To be direct, an effect must follow as an ***immediate*** consequence of the defendant's activity." *Guevara*, 608 F.3d at 1309 (citation and internal quotation marks omitted) (emphasis added). The Eleventh Circuit has framed the analysis by asking whether the "effect [was] sufficiently direct and sufficiently in the United States" such that sovereign immunity should be disregarded and the case heard by United States Courts. *Id.* (citations and internal quotation marks omitted). "[Courts] must construe the 'direct effect' requirement as embodying the 'minimum contacts' test of [personal jurisdiction] . . . ." *Weltover*, 504 U.S. at 619.

According to Plaintiffs, the alleged effect is economic harm and harm in the form of contracting or fear of contracting COVID-19. Am. Compl. ¶¶ 175, 179. However, none of those alleged harms flow directly from any of the PRC's or the CCP's alleged acts. While unclear from

the Motion,[10] Plaintiffs appear to allege that (1) the alleged cover-up of COVID-19 in China by the PRC and the CCP in China, and (2) the subsequent alleged hoarding of PPE in China—including allegedly soliciting individuals and entities to buy up PPE and ship back to China—led to economic harm and harm in the form of contracting or fear of contracting COVID-19. Am. Compl. ¶¶ 143, 148, 155, 175, 179.

There are simply too many links in the causal chain for the Foreign Defendants' alleged actions to have caused Plaintiffs' alleged harm of contracting or fear of contracting COVID-19. *Guevara*, 608 F.3d at 1309. First, Plaintiffs' claim requires this Court to find that the alleged actions of the PRC and the CCP in China caused COVID-19 to reach the shores of the United States. A key consideration here is that the inability to purchase PPE on its own could not have caused Plaintiffs' alleged harms; the alleged inability to purchase PPE allegedly harmed Plaintiffs only in that it could have led (not did lead) to a greater risk of contracting COVID-19. Indeed, there were many intervening events leading to the rise in COVID-19 infections, including the decision of infected individuals to travel to the United States, the United States' decision not to close its borders, and the effectiveness of measures implemented around the world to contain the virus. All of those events, separately or collectively, could have caused Plaintiffs' alleged injuries.

Second, Plaintiffs' alleged harm from COVID-19 requires this court to also find that the alleged hoarding in China is what caused the alleged PPE shortage in the United States, and that the alleged PPE shortage caused Plaintiffs to contract or have a fear of contracting COVID-19. But "Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994). There are numerous factors that could have contributed to the alleged shortage of PPE in the United States. These include limits placed by stores around the United States on the amount of PPE each person could

---

[10] Plaintiffs provide little detail in their Motion on the direct effect they allege occurred in the United States. They simply state "[t]he harm suffered by Plaintiffs was directly caused solely by Defendants' acts—a more direct effect cannot be posited." Mot. at 13.

purchase, countries around the world and states in the United States stockpiling PPE, and the "panic buying" of PPE. *See* Michelle Toh, *'It's Crazy': Panic Buying Forces Stores to Limit Purchases of Toilet Paper and Masks*, CNN (Mar. 6, 2020); Jennifer Peltz, *Supra.*

Third, Plaintiffs have failed to even allege facts showing a direct effect in the United States. They fail to allege a single incident where someone purchased PPE based on an alleged instruction by the PRC or the CCP, which then directly prevented a particular Plaintiff from purchasing that very PPE. Indeed, Plaintiffs cannot do so. That is because any number of people could have purchased the exact PPE from the exact store that would have been purchased by a specific Plaintiff. Plaintiffs do not even allege that the PRC and the CCP bought more masks for the purposes of their alleged scheme than they, under decision-making as sovereigns, otherwise would have to protect their own citizens.

As to the alleged economic harm, it is hard to imagine how Plaintiffs could have paid a premium for PPE—which is likely why they do not specifically allege they did—when the United States enacted countless anti-price gouging laws. *See, e.g.*, COVID-19 Price Gouging Prevention Act, H.R. 6472, 116th Cong. (2020) (aimed at "prohibit[ing] price gouging in connection with the public health emergency resulting from COVID–19"). It is even more unlikely that Plaintiffs could tie any increased price to alleged actions taken in China (particularly where countless other countries and states in the United States were stockpiling PPE to protect citizens). Jennifer Peltz, *supra*.

 The two cases cited by Plaintiffs, *Weltover*, 504 U.S. at 609–10, and *De Csepel v. Republic of Hung.*, 714 F.3d 591 (D.D.C 2013), are inapposite. *Weltover* involved the failure to pay money to a New York bank. 504 U.S. at 609–10. *De Csepel* involved the failure to deliver art in the United States. 714 F.3d at 601. In both cases it was clear that the defendants' failures led to the money or art not being delivered in the United States. Unlike the cases cited by Plaintiffs, this case does not involve, for example, the PRC and the CCP having an agreement with Plaintiffs' to provide them PPE here in the United States and the subsequent failure to do so. Even if it did, there would still be a question as to whether the failure to deliver PPE directly caused Plaintiffs to contract COVID-19. They could have contracted the virus a number of ways not caused by the failure to have PPE,

such as while they were eating and not wearing PPE. Here, the causal chain contains many links and Plaintiffs' injuries could have been caused by the many factors discussed in this Section II(A)(3) that prevent this Court from finding that the alleged actions of the PRC and the CCP abroad had a direct  and "immediate" effect in the United States. *Guevara*, 608 F.3d at 1309.

Plaintiffs' claims do not fall within the commercial activity exception. They are based on the PRC's and the CCP's response to a global pandemic, which is plainly sovereign activity. Their claims also are not in connection with commercial activity because the PRC and the CCP could not have acted as market players when they decided how to handle the COVID-19 pandemic. Even if Plaintiffs' claims were based on or in connection with commercial activity (they are not), the alleged acts of the PRC and the CCP did not cause a direct effect in the United States. Many intervening factors could have led to COVID-19 arriving in the United States and injuring Plaintiffs, such as the decisions of infected individuals to travel to the United States, PPE hoarding caused by panic buying, and the decisions of states to hoard PPE.

B.  The Noncommercial Tort Exception Does Not Apply Because the Alleged Misconduct Occurred Abroad and the First Exception to the Noncommercial Tort Exception Applies.

The second exception Plaintiffs rely on is the noncommercial tort exception to sovereign immunity. That exception, in relevant part, provides jurisdiction over cases "in which money damages are sought . . . for personal injury or death . . . occurring in the United States and caused by the tortious act or omission of that foreign state . . . ." 28 U.S.C. § 1605(a)(5). The exception applies only to "torts occurring within the territorial jurisdiction of the United States." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 (1989). There is an exception to the noncommercial torts exception for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A). If Plaintiffs' claims fit within this exception, immunity is preserved.

The noncommercial tort exception[11] does not apply for two reasons. First, Plaintiffs admit that the alleged scheme "was principally abroad . . ." (Mot. at 11), meaning that the alleged torts occurred outside the United States. *Amerada Hess Shipping Corp.*, 488 U.S. at 441.

Second, even if the alleged torts were valid (they are nothing more than an unsupported allegation), the discretionary function exception applies and bars Plaintiffs' claims. 28 U.S.C. § 1605(a)(5)(A). The discretionary exception is intended to "prevent judicial 'second-guessing' of legislative and administrative decisions" that are rooted in "social, economic, and political policy" through a tort action. *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991) (citation omitted); *Fagot Rodriguez v. Republic of Costa Rica*, 297 F.3d 1, 9 (1st Cir. 2002). Plaintiffs' allegations plainly reflect a matter of judgment and choice, as even the *Missouri* court acknowledged. *Missouri*, 2024 WL 106115, at *3 ("Whatever the wisdom of China's policy decisions, they were discretionary.").

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion should be denied in full.

---

[11] Many of Plaintiffs' tort claims would not even survive a motion to dismiss. For example, the negligent infliction of emotional distress claim fails because under Florida law, in order to allege a cause of action for negligent infliction of emotional distress "the plaintiff must have a close personal relationship to the directly injured person." *Salinero v. Johnson & Johnson,* 400 F. Supp. 3d 1334, 1353 (S.D. Fla. 2019), *aff'd*, 995 F.3d 959 (11th Cir. 2021) (citation omitted).

Dated: January 19, 2024

Respectfully submitted,

_/s/ Pravin Patel_
Pravin Patel (FBN 0099939)
Daniel P. Guernsey (FBN 001018031)
Pravin.Patel@weil.com
Daniel.Guernsey@weil.com
**WEIL, GOTSHAL & MANGES LLP**
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
(305) 577-3100 (Telephone)
(305) 374-7159 (Facsimile)

_Counsel for Defendant PetroChina International (America), Inc._

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing was filed electronically with the

Clerk of the Court using CM/ECF on January 19, 2024. As such, the foregoing was served elec-

tronically upon all counsel of record.

<div align="right" style="margin-left:40%">

*/s/ Pravin Patel*
Pravin Patel (FBN 0099939)
Pravin.Patel@weil.com
**WEIL, GOTSHAL & MANGES LLP**
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
(305) 577-3100 (Telephone)
(305) 374-7159 (Facsimile)

*Counsel for Defendant PetroChina International*
*(America), Inc.*

</div>