UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  20-cv-80604-ALTMAN/REINHART

MORIAH AHARON, et al.,

       Plaintiffs,

vs.

CHINESE COMMUNIST PARTY, et al.,

       Defendants.

_____/

## REPORT AND RECOMMENDATION REGARDING PLAINTIFFS' MOTION FOR SUBJECT MATTER JURISDICTION UNDER FSIA [ECF No. 116]

The Plaintiffs seek to hold the Chinese Community Party, the People's Republic of China, and PetroChina International (America), Inc. (collectively the "Defendants"), liable for "deliberate hoarding and monopoly of PPE" during the COVID-19 pandemic. In their Amended Complaint, Plaintiffs bring nine claims: (1) negligence, (2) toxic battery and civil assault, (3) negligent infliction of emotional distress, (4) intentional infliction of emotional distress, (5) civil aiding and abetting, (6)violation of the Sherman Act by monopolization of the mask and PPE market, (6) attempted monopolization of the mask and PPE market, (7) conspiracy to monopolize the mask and PPE market, (8) unreasonable restraint of trade, (9). ECF No. 19.  But, before the case can move forward, Judge Altman directed the parties to brief whether

the Court has subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). ECF No. 115.

Subject to exceptions, the FSIA makes foreign states "immune from the jurisdiction of the courts of the United States." 28 U.S.C. §1604. This case presents the question whether two exceptions apply. For the reasons that follow, one exception applies to Plaintiffs' PPE hoarding claims. I therefore **RECOMMEND** that Plaintiffs' Motion for the Court to find Subject Matter Jurisdiction under FSIA (ECF No. 116) be **GRANTED IN PART and DENIED IN PART.** The Defendants are immune from all of Plaintiffs' claims except the PPE hoarding claims. Therefore, Counts I–V should be dismissed without prejudice for lack of subject matter jurisdiction. *Yeh Ho v. Sabocik*, 775 Fed. Appx. 551 (11th Cir. 2019) (dismissal for lack of subject matter jurisdiction is without prejudice). The FSIA does not immunize Defendants from the hoarding conduct alleged in Counts VI–IX.[1]

---

[1]Although Plaintiffs' motion asks for a finding that the Court has subject matter jurisdiction under the FSIA, it is better viewed as an inquiry whether the FSIA immunizes Defendants. After all, the FSIA is not a statutory grant of subject matter jurisdiction. Rather, it carves out conduct over which the Court otherwise would have subject matter jurisdiction. A finding that an exception to the FSIA applies is not a finding that the Court has new jurisdiction; it is merely a finding that the Court retains whatever jurisdiction it previously had.

In the same vein, Judge Altman did not refer, and I therefore do not reach, the question whether, even if Defendants are not immune, Plaintiffs can establish Article III subject matter jurisdiction.  I reach only the question of whether the Defendants have immunity from whatever subject matter jurisdiction this Court otherwise may have.

I.    PLAINTIFFS' FACTUAL ALLEGATIONS[2]

During the COVID-19 pandemic, Plaintiffs served as "first responders and medical caregiving personnel" who did not have access to adequate supplies of personal protective equipment ("PPE") because Defendants were "hoarding PPE supplies." ECF No. 19 ¶1; ECF No. 116 at p 5. And, "as a result [of Defendants' actions] Plaintiffs were "unnecessarily exposed to the virus and suffered injury, damage, and loss." ECF No. 19 at p 3–4; ECF No. 226 at p 5. Defendants knew of the virus by at least December 2019, and actively concealed it. ECF No. 119 ¶111. Defendants did so by failing to report COVID-19 cases into the Surveillance Reporting System and forbidding Wuhan hospitals and doctors from warning others or sharing treatment information. *Id.* ¶¶54–65. Instead, the Wuhan Health Commission released a statement on December 31, 2019, that there was no evidence of human-to-human transmission, censored 45 search terms relating to the outbreak, and police began broadcasting prosecutions of doctors who continued speaking out. *Id.* ¶¶73–78. Despite the outbreak, China continued allowing large public gatherings and imposed no travel restrictions. *Id.* ¶¶95, 121. While denying a COVID-19 outbreak, the Defendants began "hoarding" PPE supplies. *Id.* ¶¶149–154. Despite its status as a "dominant worldwide PPE manufacturer," China began "importing billions of pieces of PPE from supplies around the world" and "enlist[ing] employees

---

[2] Unless otherwise noted, these facts are taken from the First Amended Complaint, ECF No. 19, which also was appended to Plaintiffs' jurisdictional motion. ECF No. 116-1.

3

of Chinese owned businesses including Defendant PetroChina America, to scour stores and supplies for [] masks." *Id.* ¶147.

PetroChina America is a New Jersey Corporation, headquartered in Texas and registered to do business and accept service in Florida. *Id.* ¶20. PetroChina America is a subsidiary of Chinese government-owned PetroChina International Co. Ltd. *Id.* ¶¶21, 147. According to the Complaint, a copy of a memorandum sent to PetroChina America instructed the company to buy as many masks as possible for export back to China. *Id.* ¶147. On May 1, 2020, the Department of Homeland Security reported the following:

> We assess the Chinese Government intentionally concealed the severity of COVID-19 from the [i]nternational community in early January while it stockpiled medical supplies by both increasing imports and decreasing exports," the May 1 DHS report states. "We further assess the Chinese government attempted to hide its actions by denying there were export restrictions and obfuscating and delaying provision of its trade data.

*Id.* ¶142.

## II.   LEGAL PRINCIPLES[3]

### 1. FSIA

The FSIA sets the parameters for when American courts "may exercise jurisdiction over a foreign state." 28 U.S.C. § 1604; *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610–11 (1992). Unless a statutory exception applies, a "foreign

---

[3] I incorporate by reference the portion of Judge Stras' opinion in *Missouri ex rel. Bailey v. People's Republic of China* discussing the meaning of a "foreign state" and both the commercial activity and noncommercial tort activity exceptions under FSIA. 90 F.4th 930 (8th Cir. 2024).

4

state shall be immune from the jurisdiction of the courts of the United States and of the States." *Id.*

A "foreign state" is the "body politic that governs a particular territory." *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010). As relevant here, the FSIA defines "foreign state" to include the foreign government, its agencies and instrumentalities:

> (a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).
>
> (b) An "agency or instrumentality of a foreign state" means any entity—
>
> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> (3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603.

The FSIA contains exceptions to the foreign state's presumptive immunity. 28 U.S.C. § 1605. Two of these exceptions are relevant here: (1) the noncommercial tort exception and (2) the commercial-activity exception. 28 U.S.C. §§ 1605(a)(2), 1605(a)(5).

If an exception applies, then "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. § 1606. If no exception applies, a federal court lacks both personal and subject-matter jurisdiction over the foreign state. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983). The plaintiff bears the initial burden to show that a

FSIA exception applies. *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1223 (11th Cir. 2018) (quoting *Universal Trading & Inv. Co., Inc. v. Bureau for Representing Ukrainian Interests in Int'l & Foreign Courts*, 727 F.3d 10, 17 (1st Cir. 2013) (citing *Saudi Arabia v. Nelson*, 507 U.S. 349)). Once the plaintiff has satisfied this burden, the defendant bears the ultimate burden of persuasion to show, by a preponderance of the evidence, that no FSIA exceptions to immunity apply. *Id.*

The noncommercial tort exception denies immunity "for personal injury or death, or damage to or loss of property occurring in the United States and caused by the tortious act or omission of a foreign state." 28 U.S.C. § 1605(a)(5). There is an exception to this exception, however. A foreign state has immunity if the noncommercial tort claim is "based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A). There is no jurisdiction over a foreign state's decisions "grounded in social, economic, and political policy." *United States v. Gaubert*, 499 U.S. 315, 323 (1991).

The commercial-activity exception denies immunity where the foreign state engages in commercial activity that either (1) is carried out in the United States, (2) occurs outside the United States but is connected to an act performed in the United States, or (3) occurs outside the United States and has a direct effect in the United States:

> A foreign state shall not be immune from the jurisdiction of the United States or of the States in any case —
> . . .

6

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or [ii] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [iii] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

As used in the FSIA, "commercial activity" means "either a regular course of commercial conduct or a particular commercial transaction or act. 28 U.S.C. § 1603(d). The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular act, rather than by reference to its purpose." *Id.* So, "whether a foreign government acts out of a profit motive or out of a desire to fulfill uniquely sovereign objectives is entirely irrelevant; rather, a court must determine whether the particular actions that the foreign state performs, whatever the motive behind them, are the type of actions by which a private party engages in trade and traffic or commerce." *Devengoechea*, 889 F.3d at 1221. In determining whether the action falls within the commercial-activity exception, a court looks at the particular conduct that constitutes the gravamen of the suit. In other words, courts focus on the core of the suit, that is, the foreign state's acts that actually injured the plaintiff. *Id.* at 1222.

For purposes of the third alternative exception, a "direct effect" is one that follows as an immediate consequence of the defendant's activity; it must be more than purely trivial or remote and attenuated, but it need not be a substantial or foreseeable effect. *Id.* at 1224. And, in determining "direct effect," courts ask whether the effect

7

was "sufficiently direct and sufficiently in the United States that Congress would have wanted an American court to hear the case." *Id.*

## III.   DISCUSSION

The First Amended Complaint — factually similar to the complaint before the Eighth Circuit in *Missouri ex rel. Bailey* — alleges that the Defendants are a foreign state that breached its duty of care to Plaintiffs by allowing COVID-19 to spread, blocking the dissemination of information about the virus, and "hoarding" PPE. 90 F.4th at 935–936. Plaintiffs say Defendants have no immunity because of the noncommercial tort exception and the commercial activity exception.

### A. *Defendants are foreign states under FSIA.*

The parties agree that the People's Republic of China and the Chinese Communist Party are foreign states within the meaning of FSIA. The People's Republic of China is the country's officially recognized government—the body politic that governs. And, the Chinese Communist Party controls and directs all activities in the People's Republic of China. ECF No. 19 ¶28. Therefore, "given its role, it is in substance the same body politic that governs [China]." *Missouri ex rel Bailey,* 90 F.4th at 935 (quoting *Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 196 (2d Cir. 2019) ("[A]n entity can be a 'foreign state' if it is an alter ego of a foreign state.")). Last, PetroChina America, is covered under the "agencies and instrumentalities" definition of "foreign state." PetroChina America is a "separate legal person, corporate or otherwise," and, "a majority of its shares or other ownership interest is owned by a foreign state or political subdivision of a foreign state." 28 U.S.C. § 1603(b). According to the

8

Complaint, PetroChina America is a subsidiary of PetroChina International— which is owned by China. ECF No. 19 ¶¶21, 147. Therefore, PetroChina America is also a foreign state under FSIA. So, all of the Defendants are "foreign states" within the meaning of FSIA.

### B. *The noncommercial-act tort exception does not apply.*[4]

The noncommercial tort exception fails for the same reasons it did in the Eighth Circuit—the discretionary function exception within the exception. *Id.* 28 U.S.C. § 1605(a)(5)(A). Here, Defendants' decisions were discretionary. It is alleged that Defendants made misleading public statements, allowed large gatherings, took legal action against doctors, and did not impose adequate travel restrictions. None of those decisions were "mandatory or forbidden in China, meaning they were the subject of "judgement or choice." *Missouri ex rel. Bailey,* 90 F.4th at 936. Said another way Defendants' decisions are "susceptible to policy analysis" and therefore outside the purview of American courts. *Id.* Plaintiffs have not met their initial burden of showing that the noncommercial tort exception applies.

---

[4]Because Plaintiffs have not met their initial burden, it does not matter that neither the People's Republic of China nor the Chinese Communist Party have appeared in this case. ECF No. 111. These defendants can still prevail on the merits.

Also, PetroChina America makes arguments on behalf of the People's Republic of China and the Chinese Communist Party as to why the commercial activity and noncommercial tort exception do not apply. ECF No. 122 at p 6–7. As Plaintiffs correctly argue, PetroChina cannot make arguments on its co-defendants' behalf. Therefore, I will disregard those arguments as applied to the co-defendants.

  C. *The commercial activity exception applies to Plaintiffs' PPE hoarding claims, but not the tort claims.*

  I classify the claims in the First Amended Complaint into two types, counts I–V are "the tort claims" and counts VI–IX are "the PPE hoarding claims." Plaintiffs say there is no immunity over the tort claims because those claims involve extraterritorial commercial activity that had a direct effect in the United States. They say there is no immunity over the PPE hoarding claims because those claims involve commercial activity carried on in the United States.

  The tort claims focus on alleged deception behind the spread of COVID-19. Specifically, Plaintiffs say Defendants did not take adequate steps to raise awareness about — and to prevent — the spread of COVID-19. Plaintiffs complain that Defendants permitted large gatherings, failed to acknowledge COVID-19, took legal action against doctors who did acknowledge it, and did not impose travel restrictions.

  First, it is unclear whether any of those activities meet the statutory definition of "commercial activity," that is, "either a regular course of commercial conduct or a particular commercial transaction or act." *See* 28 U.S.C. § 1603(d). I need not resolve that question, however.

  Second, even if Defendants' alleged activities were "commercial" within the meaning of the FSIA, the claims still fail for the same reasons they did before the Eighth Circuit—their effects were "remote and attenuated" rather than direct. *Missouri ex rel. Bailey*, 90 F.4th at 937 (quoting *Weltover*, Inc., 504 U.S. at 618).

Plaintiffs' theory is that Defendants' conduct — permitting large gatherings in China, failing to acknowledge COVID-19, taking actions against Chinese doctors, and not imposing a ban on travel out of China — had the following effects in the United States: (1) a rise in COVID-19 cases, (2) deaths, (3) overwhelmed hospitals and medical practitioners, and (4) limited access to PPE. The question I'm required to ask is whether the alleged effects were an "immediate consequence of the defendants' activit[ies]." The answer is no. Starting with the spread of COVID-19 which required intervening factors. At least one infected individual had to travel from China to other parts of the world. And then the virus had to spread from one person to another enough to reach the United States. It then takes several more steps for the COVID-19 infections to rise to a level that "overwhelmed" hospitals, medical facilities, and medical practitioners so much so that hospitals and medical facilities either run out of PPE or run low on PPE. For example, many businesses, schools, and local governments, in the United States continued to operate in 2020 until stay-at-home orders were issued. And in that time period, COVID-19 continued to spread, and case counts continued to increase.

In short, Plaintiffs have not met their initial burden of showing that the Defendants' conduct had a sufficiently-direct effect in the United States to overcome FSIA's grant of immunity. The commercial activity exception does not apply to the tort claims against all Defendants.

Plaintiffs' PPE hoarding claims are different. Plaintiffs say Defendants hoarded PPE by "importing billions of pieces of PPE from supplies around the world

11

[despite their status as a major distributor]" and "enlist[ing] employees of Chinese owned businesses including Defendant PetroChina America, to scour stores and supplies for [] masks." ECF No. 19 ¶141. Plaintiffs say Defendants "raised [mask and PPE] prices beyond prior average and restricted the ability to purchase masks and PPE." ECF No. 19 ¶¶207. First, the Defendants' alleged anticompetitive actions are commercial in nature for the same reasons the Eighth Circuit found them to be:

> Taking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment are the actions of "a private player" in the market. (quoting *Weltover*, 504 U.S. at 614). The same goes for the act of selling those items for a profit. *Id*. The Supreme Court, for its part, has distinguished between "regulations limiting foreign currency exchange," on the one hand, and "a contract to buy army boots or even bullets," on the other. *Id*. Buying and selling personal-protective equipment is much more like the latter, a "commercial activity," than the former, a "sovereign" one. *Id*. (quotation marks omitted); *see Brewer v. Socialist People's Republic of Iraq*, 890 F.2d 97, 101 (8th Cir. 1989). So is this kind of anticompetitive behavior. *Cf. Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33 S. Ct. 1865 (2018) (discussing "a class-action suit against four Chinese corporations" accused of "fix[ing] the price and quantity of vitamin C exported to the United States").

*Missouri ex rel. Bailey*, 90 F.4th at 938. Second, those commercial activities had a "direct effect in the United States." According to the Complaint, at the time of the alleged hoarding, China had superior power to influence the worldwide PPE market, including the PPE market in the United States.

> China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create those effects. *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen.*, 600 F.3d 661, 664–66 (D.C. Cir. 2010); cf. Minn-Chem, Inc. v. Agrium, Inc., 683 F.3d 845, 859 (7th Cir. 2012) (interpreting a different statute and concluding that "foreign supply restrictions, and the concomitant price increases forced upon ... purchasers, were a direct—that is, proximate—

> cause of ... subsequent price increases in the United States"). They singlehandedly "t[ook] over factories that ma[d]e masks" and cornered the market before the rest of the world realized what was happening. Then, when the virus spread and people all over the world became sick, China was able to maintain its stockpile and prolong the shortage. The most basic supply-and-demand principles tell us that these market effects depended little, if at all, "on variables independent" of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time. *Guirlando v. T.C. Ziraat Bankasi A.S.,* 602 F.3d 69, 75 (2d Cir. 2010) (citation omitted); *see also Ball Memorial Hosp., Inc. v. Mut. Hosp. Ins.*, Inc., 784 F.2d 1325, 1336 (7th Cir. 1986) (explaining that the ability to "control output and prices" largely depends on the ability of other market players "to increase their own output in response to a contraction by the defendants"); *cf. Herbert Hovenkamp, Federal Antitrust Policy* 4 (6th ed. 2020) (noting that "all participants in the market [must] have good knowledge about price, output[,] and other information" for conditions to be most "conducive to competition"). Other market players simply had no time or ability to respond. *See Ball Memorial Hosp.*, 784 F.2d at 1336.

*Missouri ex rel. Bailey,* 90 F.4th at 939. Lastly, the commercial activities have a "connection with" the "particular conduct" that constitutes the gravamen of the suit, that is the PPE hoarding. *Devengoechea*, 889 F.3d at 1222.

PetroChina America argues that the PPE hoarding is not the gravamen of the suit. ECF No. 122 at pp 8–10. PetroChina America says Plaintiffs' PPE hoarding claims do not survive without their tort claims. *Id.* I disagree. Even without the tort claims, the Complaint still plausibly alleges that at the time of the alleged hoarding, the world was unaware of the scope of the pandemic. Plaintiffs allege the same theory Missouri brought before the Eighth Circuit—"China leveraged the world's ignorance about COVID-19 [] by manipulating the worldwide [PPE] market." *Missouri ex rel. Bailey,* 90 F.4th at 939. Whether Plaintiffs can meet those elements at a later stage is another question not before me. But, for purposes of FSIA immunity only, I find

13

that Plaintiffs have met their burden on the PPE hoarding claims. And, PetroChina America has not met its burden of showing by a preponderance of the evidence that the commercial activity exception does not apply.[5]

## **REPORT AND RECOMMENDATION**

For these reasons, I recommend that the District Court grant Plaintiffs' Motion in part and deny it in part.

---

[5] Here, the non-appearance of the People's Republic of China and the Chinese Communist Party is dispositive because they have not offered any evidence to rebut the Plaintiffs' initial showing that the commercial activity exception applies.

## NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Roy K. Altman, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**If counsel do not intend to file objections, they shall file a notice advising the District Court within FIVE DAYS of this Report and Recommendation.**

**DONE and SUBMITTED** in Chambers at West Palm Beach, Palm Beach County, in the Southern District of Florida, this 25th day of November 2024.

_____
BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE