UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MORIAH AHARON, et al.,

    Plaintiffs,

vs.

CHINESE COMMUNIST PARTY, et al.,

    Defendants.

Civil Action No. 9:20-cv-80604-RKA

**DEFENDANT PETROCHINA INTERNATIONAL (AMERICA), INC.'S
RESPONSE TO PLAINTIFFS' OBJECTIONS TO MAGISTRATE'S REPORT AND
RECOMMENDATION REGARDING SUBJECT MATTER JURISDICTION**

  In their Objections to Magistrate's Report and Recommendation Regarding Subject Matter Jurisdiction [ECF No. 136] (the "Objection"), Plaintiffs propound a hodgepodge of arguments that are off the point and misunderstand the relevant legal inquiry, are self-contradictory, and are facially unreasonable. As set forth herein, the Objection should be denied, and the Court should adopt the Magistrate Judge's finding that no Count of the Amended Complaint[1] falls within the noncommercial tort exception of the FSIA, and that Counts I through V do not fall within the commercial activity exception of the FSIA.

  Plaintiffs begin their Objection by arguing that the discretionary function exception to the noncommercial tort exception is inapplicable. That exception preserves immunity where a sovereign's alleged misconduct arises from its discretionary choices about public policy. Plaintiffs point

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to them in Defendant PetroChina International (America), Inc.'s Objections to Report and Recommendation [ECF No. 135].

to an alleged Chinese directive that allegedly requires Chinese citizens to obey the Chinese government, stating that this directive demonstrated that the Foreign Defendants' alleged actions were not discretionary, but rather mandated by law. But Plaintiffs did not sue these alleged Chinese citizens; they sued the Foreign Defendants. A law about obeying the Foreign Defendants does not equate to a law requiring the Foreign Defendants to act a certain way. Plaintiffs also argue that the discretionary function exception does not apply because the alleged decisions of the Foreign Defendants were not grounded in public policy concerns. This argument is undermined by Plaintiffs' repeated allegations in the Amended Complaint that even the alleged hoarding of PPE was done for political gain in an attempt to "usurp the U.S. as the leading super-power." *E.g.*, Am. Compl. ¶¶ 143, 153, 207.

Plaintiffs' arguments regarding the commercial activity exception suffer from similar flaws. First, addressing whether the conduct underlying Counts I through V was commercial, Plaintiffs argue that COVID-19 was created in either a lab at the Wuhan Institute of Virology ("WIV") or at a Wuhan wet market, which Plaintiffs allege—based on conclusory statements alone[2]—serve commercial purposes. While according to Plaintiffs' allegations, the creation of COVID-19 in the WIV lab or Wuhan wet market may have *led to* the alleged mishandling of COVID-19 by the Foreign Defendants, that alleged creation is not the *basis* of Plaintiffs' suit; Plaintiffs' allegations primarily relate to the alleged mishandling of COVID-19, not its creation. Regardless, the FSIA expressly instructs courts to not consider purpose, such as the alleged purpose of the locations where COVID-19 was allegedly created, when determining whether a specific act is commercial. *Saudi Arabia v. Nelson*, 507 U.S. 349, 362–63 (1993).

---

[2] *E.g.*, Am. Compl. ¶ 44 (Defendants "allowed the work at WIV to continue for commercial gain, and the profit appetite of the Chinese Academy of Sciences"); ¶ 49 (Defendants "chose to let [wet market trade] continue and participate in it themselves for economic gain").

Second, Plaintiffs' remaining arguments, equating suppressing information to something a private company could do, stretch the alleged conduct so thin that, if applied to undisputably sovereign acts, would erase their sovereign nature and effectively eradicate the FSIA's presumption of immunity. Such a tactic has been squarely rejected by the Supreme Court. *See OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35–36 (2015). Moreover, the alleged acts of the Foreign Defendants cannot be equated to those of a private company because, by virtue of its sovereign police power, only a foreign sovereign can coerce the suppression of information: private actors can only attempt to persuade others to act through incentives like increased stock value.

Third, Plaintiffs end by addressing the direct effect requirement of the commercial activity exception. Their argument is that the Foreign Defendants' alleged acts abroad caused a direct effect in the United States because all that was required for COVID-19 to reach the United States was breathing, coughing, and sneezing. That argument is as incredible as it is wrong. No amount of breathing, coughing, or sneezing could get COVID-19 from China to the United States, thousands of miles away. As the Magistrate Judge correctly noted, individuals would have to choose to travel from China to the United States. And, even so, once COVID-19 got to the United States, decisions by businesses and local governments to operate until stay-at-home orders issued caused COVID-19 to spread even further than it otherwise would have. From there, COVID-19 had to rise to levels sufficient to "overwhelm" the nation and create the alleged PPE shortage. Other factors, such as port closures, and decisions by states in the United States to stockpile PPE also could have caused Plaintiffs' alleged harm. There were simply too many intervening events that needed to occur in order for the alleged actions of the Foreign Defendants to have any effect in the United States.

## BACKGROUND

As with its Response to Plaintiffs' Motion [ECF No. 122], PetroChina submits this response to Plaintiffs' Objection because it believes—as the Court alluded to [Oct. 10, 2023 Hr'g

Tr. at 10]—that if the Court finds that it lacks subject matter jurisdiction over the Foreign Defendants, and dismisses the claims against them, it will be case dipositive for PetroChina as well. PetroChina is not arguing on behalf of any other party. Indeed, subject matter jurisdiction may be raised by any party at any time, including by the Court *sua sponte*. PetroChina is also not an agency or instrumentality of any foreign sovereign, as it is incorporated under the laws of New Jersey with its principal place of business in Texas. 28 U.S. Code § 1603(b)(3).

## **LEGAL STANDARD**

Under the FSIA, foreign sovereigns are presumptively immune from suit, unless an exception applies. *Federal Republic of Germany v. Philipp*, 592 U.S. 169, 176 (2021); *Santivanez v. Estado Plurinacional De Bolivia*, 512 Fed. App'x 887, 888 (11th Cir. 2013). The FSIA imposes on "[a] plaintiff who seeks to sue a foreign state" the "burden" of "'producing evidence' that one of the FSIA's [] exceptions applies." *Sequeira v. Republic of Nicaragua*, 815 F. App'x 345, 348–49 (11th Cir. 2020) (quoting *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1312–13 (11th Cir. 2009)).

In their Objection, Plaintiffs argue that the commercial activity exception applies to Counts I through V of the Amended Complaint, and that the noncommercial tort exception applies to all Counts in the Amended Complaint. Obj. at 2. Relevant here, the commercial activity exception to sovereign immunity provides jurisdiction when a claim is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The noncommercial tort exception revokes sovereign immunity over cases "in which money damages are sought . . . for personal injury or death . . . occurring in the United States and caused by the tortious act or omission of that foreign state . . . ." 28 U.S.C. § 1605(a)(5). The exception applies only to "torts occurring within the territorial jurisdiction of the United States." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 (1989); *Jerez v. Republic of Cuba*, 775 F.3d 419, 424

(D.C. Cir. 2014) ("[B]oth the tort and the injury must occur in the United States.") (quoting *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 842 (D.C. Cir. 1984)).

When ruling, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). This de novo review includes both conclusions of law and fact made by a magistrate judge. *See id.* advisory committee's note ("The term 'de novo' signifies that the magistrate's findings are not protected by the clearly erroneous doctrine."); *Jackson v. S. Title Holding Co. LLC.*, 2022 WL 21747286, at *1 (M.D. Fla. Sept. 1, 2022) ("The Court reviews de novo the Magistrate Judge's proposed findings of fact and legal conclusions to which Plaintiff objected.") (citation and emphasis omitted); *see also Knezevich v. Ptomey*, 761 F. App'x 904, 906 (11th Cir. 2019) ("When a party fails to raise a proper objection to the magistrate judge's report and recommendation, that party waives its right to review findings of facts and legal conclusions on appeal unless there was plain error.").

## ARGUMENT

**I.    The Noncommercial Tort Exception Does Not Apply.**

As a threshold matter, Plaintiffs admit that the alleged scheme by the Foreign Defendants "was principally abroad . . . ," meaning that the alleged torts occurred outside the United States. Plaintiffs' Motion for the Court to Find Subject Matter Jurisdiction under the F.S.I.A. for the Purposes of Default Final Judgment, at 7  [ECF No. 116]; *Amerada Hess Shipping Corp.*, 488 U.S. at 441. Therefore, because the "entire tort" was not committed within the United States, the noncommercial tort exception does not apply. *Doe v. Federal Democratic Republic of Ethiopia*, 189 F. Supp. 3d 6, 17–19 (D.D.C. 2016).

Even assuming the alleged scheme did occur in the United States (it did not), there is an exception to the noncommercial tort exception for "any claim based upon the exercise or perfor-

mance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A). If that exception, often called the "discretionary function exception," applies, sovereign immunity exists. The Supreme Court has stated that the discretionary function exception applies when the conduct at issue was a matter of choice and therefore "will not apply when a []statute, regulation, or policy *specifically* prescribes a course of action" because then the alleged act is not discretionary. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (emphasis added). It has also stated that even if conduct does involve a matter of judgment, it must be based on considerations of public policy. *Id.* at 537. On this point, the question essentially is whether the discretionary action is grounded in "social, economic, or political goals." *United States v. Gaubert*, 499 U.S. 315, 323 (1991).

The Magistrate Judge found that the discretionary function exception applies because the alleged acts of the Foreign Defendants—making misleading statements, allowing large gatherings, taking legal action against doctors, and not imposing travel restrictions—were not "mandatory or forbidden in China, meaning they were the subject of 'judgement or choice.'" R. & R. at 9 [ECF No. 130] (citing *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930 (8th Cir. 2024)).

First, Plaintiffs' Objection argues that the Magistrate Judge improperly found that the discretionary exception applies because the Foreign Defendants' alleged conduct was not a matter of choice and did not involve considerations of public policy. Obj. at 4.

Plaintiffs incorrectly argue that the Foreign Defendants' alleged acts were not a matter of choice because the "Military-Civil Fusion (MCF)" allegedly "require[d] citizens and Chinese expats alike to do whatever the government tells them to do . . . ." *Id.* Plaintiffs' arguments regarding

6

the MCF are not only irrelevant, but flat-out wrong.[3] Plaintiffs' claims are against the Foreign Defendants for their alleged misconduct. Plaintiffs are not suing the "citizens and Chinese ex-pats" that are allegedly bound by the MCF. This nuance is critical because Plaintiffs have pointed to no law (because there is none) that "specifically" would require the Foreign Defendants to act the way the Plaintiffs alleged they acted in the Amended Complaint. *Berkovitz*, 486 U.S. at 536 (noting the discretionary function exception "will not apply when a []statute, regulation, or policy ***specifically*** prescribes a course of action") (emphasis added). In any country, including the United States, when the government issues a law, its citizens must follow it or face repercussions. Therefore, the fact that citizens must obey their government (or face consequences for not doing so) cannot mean that the actions of a government are non-discretionary, otherwise there could be no discretionary acts by the government.

Plaintiffs also incorrectly argue that the alleged actions of the Foreign Defendants did not involve considerations of public policy. Obj. at 4. Plaintiffs make this argument without any explanation or analysis, instead, citing two inapposite cases. *Id.* (citing *Cope v. Scott*, 45 F.3d 445, 450 (D.C. Cir. 1995), and *Usoyan v. Republic of Turkey*, 6 F.4th 31, 45 (D.C. Cir. 2021)). Plaintiffs' claims are properly viewed as an attack on the manner in which the Foreign Defendants handled COVID-19, and, thus, their alleged acts are undoubtedly rooted in "social, economic, or political goals . . . ." *Gaubert*, 499 U.S. at 323. But even if this Court were to parse out any alleged PPE hoarding by the Foreign Defendants, their alleged actions were still grounded in "social, economic, or political goals . . . ." *Id.*

---

[3] What Plaintiffs refer to as the MCF is even recognized by the United States Department of Sate as having nothing to do with Chinese citizens or expats obeying the Chinese government. What is MCF, U.S. DEP'T OF STATE, https://www.state.gov/wp-content/uploads/2020/05/What-is-MCF-One-Pager.pdf (describing the MCF as "the CCP's strategy to develop the People's Liberation Army (PLA) into a 'world class military' by 2049").

7

Any response to COVID-19 or alleged PPE hoarding is protected under the discretionary function exception because it is not a garden-variety discretionary act like the decision to put up a traffic sign at issue in *Cope*, 45 F.3d at 451–52, or the exercise of poor discretion by an employee that leads to an automobile accident—an example the Supreme Court provided in *Gaubert*, 499 U.S. at 332. Nor are the Foreign Defendants' alleged actions similar to the attacks by Turkish security detail on protestors outside of the Turkish Embassy in Washington, D.C.—the conduct at issue in *Usoyan*, 6 F.4th at 45. There, the court held that the Turkish security detail's actions were not "plausibly grounded in considerations of security-related policy" because their conduct in the moment was akin to "the limited way that a police officer effectuates public policy when he gives chase to a fleeing vehicle." *Id.* at 46–47. But the conduct at issue here is not like an officer's split-second decision in a car chase, or attacks on protestors in *Usoyan*; rather, the Foreign Defendants' alleged actions are more like the decisions made by Qatar "in response to a diplomatic and economic boycott" as part of a "public-relations strategy 'to influence public opinion in the United States,'" which the Ninth Circuit found undoubtedly "involved considerations of public policy." *Broidy Capital Mgmt., LLC v. Qatar*, 982 F.3d 582, 593 (9th Cir. 2020) (internal quotation marks omitted). Indeed, Plaintiffs themselves argue throughout the Amended Complaint that the alleged response to COVID-19 or alleged PPE hoarding was done for political gain in an attempt to "usurp the U.S. as the leading super-power." *E.g.*, Am. Compl. ¶ 143 ("They have done this for commercial and political gain."); ¶ 153 ("[T]he CCP and the PRC used the pandemic and their stranglehold on the mask market to curry political favor around the world as they try to unseat the United States as the leading super-power . . . ."); ¶ 207 ("then raised prices well beyond prior averages, and restricted the ability to purchase the masks and PPE, or only granted the ability to acquire or purchase the supplies if it served a political purpose to usurp the U.S. as the leading super-power.").

Therefore, no matter how Plaintiffs frame them, the Foreign Defendants' alleged actions involved considerations of public policy.

Second, without pointing to any law (or anything other than their own allegations in the Amended Complaint), Plaintiffs argue that the Foreign Defendants acted illegally and therefore the discretionary function exception does not apply. Obj. at 4–5. In support of this point, Plaintiffs argue that "the Report recognized the illegality contained in Counts VI through IX of the Amended Complaint." *Id.* at 4–5. But the Magistrate Judge did not recognize any illegality. The Magistrate Judge ruled only on the issue of whether sovereign immunity existed. He did not rule on the merits of Plaintiffs' claims. Indeed, he expressly stated that whether the Plaintiffs can prove their claims "at a later stage is another question not before [him]." R. & R. at 13. Moreover, even if the Magistrate Judge did rule on any alleged illegality, Plaintiffs ignore that a violation of United States domestic law, alone, does not defeat the protections offered by the discretionary function exception. *See, e.g.*, *Usoyan*, 6 F.4th at 45 n.8 (noting violation of local laws does not "automatically prevent designation" of acts as discretionary); *Broidy*, 982 F.3d at 591–92 ("[T]he *policy discretion* of a *foreign sovereign* is not evaluated by [federal rules and regulations], but rather by the corresponding limitations that bind *that* sovereign, whether contained in its own domestic law or (we will assume) in applicable and established principles of international law.") (emphasis in original).

As to any alleged violation of Chinese or international law, Plaintiffs point to no law that the Foreign Defendants allegedly violated—nor could they because no such law exists. Plaintiffs offer only self-contradiction. It cannot be the case that the Foreign Defendants were allegedly required by the MCF to act a certain way and allegedly acted in accordance with that law (Obj. at

9

4), and that the Foreign Defendants acted "illegally" (i.e., contrary to law) and therefore the discretionary function does not apply.

Therefore, the Magistrate Judge's finding that the noncommercial tort exception does not apply to all Counts of the Amended Complaint should be upheld.

Finally, while not addressed by the Objection or the Magistrate Judge, the second exception to the noncommercial tort exception applies and bars Plaintiffs' claims. Under the second exception, "any claim arising out of . . . misrepresentation [or] deceit" falls out of the noncommercial tort exception and immunity is thus preserved. 28 U.S.C. § 1605(a)(5)(B). Here, Plaintiffs allege that "the CCP and the PRC knew that COVID-19 was dangerous and capable of causing a pandemic, yet deceived the world about its dangers, actively concealed it until it was too late, and failed to contain it when they could have . . . ." Am. Compl. ¶ 3. Therefore, Plaintiffs' claims are based on alleged misrepresentations by the Foreign Defendants and barred as they fall within the second exception to the noncommercial tort exception. *Kozorowski v. Russian Fed'n*, 124 F.3d 211 (9th Cir. 1997) (finding Section 1605(a)(5)(B) applied to allegations that Russia lied and concealed the truth about murdering Polish Army officers during WWII).

## II. The Commercial Activity Exception Does Not Apply Either.

The Magistrate Judge found that Counts I through V of the Amended Complaint, what he referred to as the "tort claims," did not fall within the commercial activity exception because any alleged misconduct of Foreign Defendants did not have a direct effect in the United States. R. & R. at 11.[4] Specifically, the Magistrate Judge found that Plaintiffs' alleged harm was not the "immediate consequence of the defendants' activit[ies]." *Id.* The Magistrate Judge stated:

---

[4] The Magistrate Judge stated that he need not determine whether the alleged "deception behind the spread of COVID-19" was commercial activity because he found there could be no direct effect. *Id.* at 10.

10

> At least one infected individual had to travel from China to other parts of the world. And then the virus had to spread from one person to another enough to reach the United States. It then takes several more steps for the COVID-19 infections to rise to a level that "overwhelmed" hospitals, medical facilities, and medical practitioners so much so that hospitals and medical facilities either run out of PPE or run low on PPE. For example, many businesses, schools, and local governments, in the United States continued to operate in 2020 until stay-at-home orders were issued. And in that time period, COVID-19 continued to spread, and case counts continued to increase.

*Id.*

Plaintiffs argue that the allegations in Count I through V are commercial and caused a direct effect in the United States, adding that the Magistrate Judge's ruling should be reversed because he failed to consider several allegations. Obj. at 2–3, 5–7.

    A.    *Counts I Through V Are Not Based on Commercial Activity.*

Plaintiffs argue that the alleged acts underlying Counts I through V were commercial. Particularly, Plaintiffs argue that the potential locations where COVID-19 was allegedly created, in the WIV lab or the Wuhan wet market, exist for commercial activity, and that suppressing information about a deadly virus is no different than a private company suppressing information about a defective product that might affect its stock price. *Id.* at 5–6.

Plaintiffs' arguments relating to the WIV lab and the Wuhan wet market are conclusory and off the point. As an initial matter, Plaintiffs provide no evidence to support their allegation that the WIV lab is a commercial venture.[5] Lack of evidence aside, the alleged purpose of the WIV lab and Wuhan wet market cannot dictate whether the Foreign Defendants' actions were sovereign.

---

[5] In fact, the district court in *Missouri ex rel. Schmitt v. China*, 610 F. Supp. 3d 1174, 1187 (E.D. Mo. 2022), found that the WIV engages in "core governmental functions integral to China's national interests rather than predominantly commercial activities." Therefore, whether the WIV serves a commercial or sovereign purpose is, at least, a question of fact that Plaintiffs have not adequately addressed with their conclusory statements.

11

Plaintiffs' arguments here are similar to those rejected by the Supreme Court in *Nelson*, 507 U.S. 349. In *Nelson*, Saudi Arabia recruited an employee (who was a United States citizen) to work at a hospital. *Id.* at 358. While working at the hospital, the employee began reporting safety violations, and was then arrested by the Saudi Government and tortured. *Id.* at 364. Despite the fact that the employee's work in *Nelson* originated from a commercial purpose (employment at a hospital), the Supreme Court held that the defendant's alleged actions did not fall within the commercial activity exception. *Id.* The Supreme Court noted that while the recruitment to work at the hospital "led to the conduct that eventually injured the [employee], [it was] not the basis for the [employee's] suit." *Id.* at 358. Here, as alleged by Plaintiffs, the core misconduct by the Foreign Defendants is the failure to contain and subsequent concealment and misrepresentations regarding the effects of COVID-19—not the alleged creation of the virus itself. This is underscored by the opening paragraphs of the Amended Complaint, which allege that "the CCP and the PRC knew that COVID-19 was dangerous and capable of causing a pandemic, yet deceived the world about its dangers, actively concealed it until it was too late, and failed to contain it when they could have . . . ." Am. Compl. ¶ 3. Therefore, like in *Nelson* even if the creation of COVID-19 "led to the conduct that eventually injured [Plaintiffs], [it is] not the basis for [Plaintiffs'] suit." *See* 507 U.S. at 358.

The Supreme Court in *Nelson* specifically rejected the argument "that the Saudi Government 'often uses detention and torture to resolve commercial disputes,'" as "off the point, for it goes to purpose." *Id.* at 362–63. Likewise, the argument that the WIV lab or Wuhan wet market were allegedly created for and used for commercial purposes is "off the point, for it goes to purpose, the very fact the [FSIA] renders irrelevant to the question of an activity's commercial character." *Id.*

12

Equating the suppressing of information relating to COVID-19 and private companies suppressing information about a product also does not move the needle. Obj. at 6.[6] As aptly noted by one court, "there is no logical limit (other than semantic creativity), to the Court's ability to . . . parse the activities underlying the claim and thus strip them of their sovereign character." *Fagot Rodriguez v. Republic of Costa Rica*, 139 F. Supp. 2d 173, 192–93 (D.P.R. 2001). Almost any sovereign act can be parsed and broken down into pieces that do not appear to be sovereign. For example, entering into a treaty can be boiled down to nothing more than an agreement, and private parties are capable of entering into agreements. But private parties cannot enter into treaties just like they cannot control a nation's response to a deadly virus within its borders. Unlike a private party, a foreign sovereign has police powers, which it can use to force action. *Lubian v. Republic of Cuba*, 440 F. App'x 866, 868 (11th Cir. 2011) ("[A] foreign state's exercise of the power of its police has long been understood . . . as peculiarly sovereign in nature. Exercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce.") (*quoting Nelson*, 507 U.S. at 361–62). Private parties have no such police power. *Id.* They can try only to persuade others to act, through, for example, monetary incentives like increased stock value in Plaintiffs' example.

---

[6] Even the alleged taking over of factories and restricting PPE exports—apart from being measures the Foreign Defendants took to protect their citizens from COVID-19—are squarely sovereign acts. *Sequeira*, 815 F. App'x at 348–49 (commercial activity exception did not apply to Nicaragua's sale of meat products because it arose from the taking of land, a sovereign act); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614–15 (1992) (finding that "regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party"); *Chisholm & Co. v. Bank of Jamaica*, 643 F. Supp. 1393, 1401 (S.D. Fla. 1986) (noting that "[t]he regulation of imports and exports is a sovereign prerogative"). Indeed, even the United States restricted the export of PPE during the COVID-19 pandemic.

Plaintiffs' hairsplitting would effectively eradicate the commercial activity exception and allow plaintiffs to end-run sovereign immunity, a tactic which the Supreme Court has rejected on multiple occasions. *E.g.*, *OBB Personenverkehr*, 577 U.S. at 35–36 (2015) ("To allow such 're-cast[ing]' of a complaint . . . would 'give jurisdictional significance to [a] feint of language,' thereby 'effectively thwart[ing] the [FSIA's] manifest purpose.'") (quoting *Nelson*, 507 U.S. at 363). Indeed, the Supreme Court expressly recognized that a "plaintiff could recast virtually any claim" as one of commercial activity. *Nelson*, 507 U.S. at 363. That is why, not only should the Court reject Plaintiffs' hairsplitting as it relates to Counts I through V, but also why the remaining Counts VI through IX (which the Magistrate Judge found comprise Plaintiffs' PPE hoarding allegations) should be dismissed; no matter how Plaintiffs try to spin their claims, their core harm as they have alleged it is contraction of a virus that they allege would not have arrived to the United States if the Foreign Defendants would not have mishandled COVID-19. Am. Compl. ¶ 123 (alleging that "95% of infections could have been prevented" had the PRC and the CCP properly responded to the COVID-19 virus); *OBB Personenverkehr*, 577 U.S. at 35–36 ("[T]here is nothing wrongful about the sale of the Eurail pass standing alone. Without the existence of the unsafe boarding conditions in Innsbruck, there would have been nothing to warn Sachs about when she bought the Eurail pass. However Sachs frames her suit, the incident in Innsbruck remains at its foundation.").

How the Foreign Defendants handled or responded to COVID-19 is plainly sovereign activity and therefore does not fall within the commercial activity exception. *See Eisenberg v. People's Republic of China*, 2022 WL 1591541, at *5 (D. Mass. May 19, 2022) ("Eisenberg's allegations that PRC government officials engineered COVID-19, decided to conceal information concerning its escape from a lab, and failed to prevent the spread of the virus by, among other things,

14

permitting international air travel is not subject to the commercial activity or noncommercial tortious activity exceptions to the FSIA.").

        B.     *The Alleged Misconduct Underlying Counts I Through V Did Not Cause a Direct Effect in the United States.*

Plaintiffs argue that the Foreign Defendants' actions abroad caused a direct effect in the United States because "[a]ll it took was for people to keep breathing, sneezing, and coughing, which was out of an infected person's control," in order for COVID-19 to reach the United States. Obj. at 6. This argument strains credulity. Plaintiffs' argument that the Magistrate Judge failed to consider the allegations in the Amended Complaint that "that there were direct flights between Wuhan and major U.S. cities," proves the point that more than breathing, coughing, and sneezing was required. As the Magistrate Judge correctly noted, under Plaintiffs' allegations, COVID-19 had to get from China to the United States. No amount of coughing or sneezing (much less breathing) could accomplish that. Instead, infected individuals had to voluntarily decide to get on flights from China to the United States. Whether those flights were direct or indirect is immaterial. Even once in the United States, the Magistrate Judge correctly noted that "[i]t then takes several more steps for the COVID-19 infections to rise to a level that 'overwhelmed' hospitals, medical facilities, and medical practitioners so much so that hospitals and medical facilities either run out of PPE or run low on PPE. For example, many businesses, schools, and local governments, in the United States continued to operate in 2020 until stay-at-home orders were issued." Obj. at 11.

There are several additional intervening factors that the Magistrate Judge did not address that further undermine any direct effect. For example, countless other countries and states in the United States were stockpiling PPE to protect citizens. *E.g.*, Jennifer Peltz, *States Trash Masks and Pandemic Gear as Huge Stockpiles Linger and Expire*, PBS (Dec. 20, 2023).

That is why the Court should reject Plaintiffs' argument that the fact that COVID-19 allegedly "shut down the United States and the world in mere months," proves that the effects of the Foreign Defendants' alleged actions were direct. Obj. at 6–7. Whether the effect was felt within days, months, or years is not relevant to the inquiry; the question is whether there were intervening events, of which there were many at play here. All of the factors mentioned above could have led to COVID-19 allegedly "shutting down the U.S. in mere months": the voluntary travel to the United States of infected individuals; the closing of United States ports; the decisions by states in the United States to not shut down earlier and to stockpile PPE for its citizens; and businesses and schools in the United States deciding to stay open until stay-at-home orders were issued. Plaintiffs do not even attempt to demonstrate how the above factors, whether individually or collectively, did not lead to their alleged contraction of COVID-19.

*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994), relied on by Plaintiffs in their Objection, demonstrates exactly why there is no direct effect here. In *Mangyshlakneft*, a United States entity and a foreign sovereign entity entered into a contract relating to certain oil products. A third-party refinery was to issue certain payments to the parties. *Id.* at 1235. The refinery was to remit payment to a bank in London, which then converted the payment into dollars and then disbursed the dollars to the United States entity's bank account in the United States and the foreign sovereign entity's bank in Paris. The refinery failed to pay on one occasion and the United States entity sued the foreign sovereign entity, attempting to avoid the FSIA by arguing that the conversion of the payment into dollars via a New York bank reflected a direct effect in the United States. The Court rejected the argument, finding that "Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." *Id.* at 1238. There is even less of a direct effect

16

here. The parties in *Mangyshlakneft* specifically contracted for payment to be converted into United States dollars, and then transferred to the sovereign foreign entity's bank account in Paris. Therefore, there was some intention that the transaction would pass through the United States. Here, Plaintiffs do not allege any specific effort by the Foreign Defendants to send COVID-19 to the United States. All they have to offer is that the Foreign Defendants allegedly failed to prevent its escape from China.

This case is more akin to the press release in *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 237 (2d Cir. 2002) that fell "at the end of a long chain of causation and [was] mediated by numerous actions by third parties." In *Virtual Countries*, the plaintiff owned the website "southafrica.com." *Id.* at 233–34. South Africa put out a press release in South Africa stating that it would pursue international legal action to take ownership of the website. *Id.* The plaintiff sued, arguing that the press release impacted its business by damaging its ability to raise capital, in light of fears of losing the website. *Id.* at 237. The Second Circuit found that the FSIA did not apply because the plaintiff could not show that the press release had a direct effect in the United States. *Id.* "At a minimum, two independent kinds of actors—first the press and then investors, potential investors, and potential business partners—intervened between issuance of the press release and any alleged injurious effect on the plaintiff." *Id.* Like in *Virtual Countries*, "[a]t a minimum, two independent kinds of actors . . . intervened" here: (i) those infected with COVID-19 that came to the United States; and (ii) businesses, schools, and other organizations that remained open until forced to close by stay-at-home orders. *See id.*; *see also* R. & R. at 11. There were additional independent actors, like states that stockpiled PPE. Like in *Virtual Countries*, "[t]his tangled causal web does not provide the requisite immediacy to establish jurisdiction." 300 F.3d at 237–38.

Therefore, the Magistrate Judge correctly held that the alleged actions underlying Counts I through V of the Amended Complaint did not cause a direct effect in the United States, and the commercial activity exception did not apply.

## CONCLUSION

For the foregoing reasons, the Court should adopt the Magistrate Judge's finding that the noncommercial tort exception of the FSIA does not apply to Counts I through IX of the Amended Complaint, and the Magistrate Judge's finding that Counts I through V of the Amended Complaint do not fall within the commercial activity exception of the FSIA.

Dated: January 27, 2025

Respectfully submitted,

*/s/ Pravin R. Patel*
Pravin Patel (FBN 0099939)
Daniel P. Guernsey (FBN 001018031)
Pravin.Patel@weil.com
Daniel.Guernsey@weil.com
**WEIL, GOTSHAL & MANGES LLP**
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
(305) 577-3100 (Telephone)
(305) 374-7159 (Facsimile)

*Counsel for Defendant PetroChina International (America), Inc.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing was filed electronically with the Clerk of the Court using CM/ECF on January 27, 2025. As such, the foregoing was served electronically upon all counsel of record.

*/s/ Pravin R. Patel*
Pravin Patel (FBN 0099939)
Pravin.Patel@weil.com
**WEIL, GOTSHAL & MANGES LLP**
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
(305) 577-3100 (Telephone)
(305) 374-7159 (Facsimile)

*Counsel for Defendant PetroChina International (America), Inc.*