UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-cv-80604-ALTMAN/Reinhart

**MORIAH AHARON,** *et al.*,

     *Plaintiffs,*

*v.*

**CHINESE COMMUNIST PARTY**, *et al.*,

     *Defendants.*

_____/

**ORDER ADOPTING IN PART AND
<u>REJECTING IN PART REPORT AND RECOMMENDATION</u>**

This case began during the first few months of the COVID-19 pandemic. Our Plaintiffs—
"doctors, nurses, paramedics, EMTs, and other front-line medical care workers in the United States
and the State of Florida"—accused the Chinese Communist Party ("CCP"), the People's Republic of
China ("PRC"), and PetroChina International (America), Inc. (our Defendants) of "hoarding and
stockpiling Personal Protective Equipment ('PPE'); forbidding factories located in China . . . from
exporting PPE to the United States; and causing shortages and artificially inflated pricing of PPE."
Amended Complaint [ECF No. 19] ¶ 1. After the Plaintiffs spent many years trying to serve the CCP
and the PRC, we ordered the Plaintiffs to file a motion to determine whether we had subject-matter
jurisdiction over this action under the Foreign Sovereign Immunities Act ("FSIA"). *See* Oct. 25, 2023,
Order [ECF No. 112] at 1 ("[B]y November 8, 2023, the Plaintiffs must file a motion for default final
judgment only on the question of subject matter jurisdiction under the Foreign Sovereign Immunities
Act[.]").

The Plaintiffs filed their "Motion for the Court to Find Subject Matter Jurisdiction Under the
FSIA" (the "SMJ Motion") on December 7, 2023. [ECF No. 116]. After the parties fully briefed the
SMJ Motion, *see* Response to Plaintiffs' Motion to Find Subject Matter Jurisdiction ("SMJ Response")

[ECF No. 122]; Reply in Support of Motion to Find Subject Matter Jurisdiction ("SMJ Reply") [ECF No. 127], we referred the SMJ Motion to Magistrate Judge Bruce E. Reinhart for a Report and Recommendation, *see* Order of Referral [ECF No. 129]. Magistrate Judge Reinhart recommended that we grant in part and deny in part the SMJ Motion. *See* Report and Recommendation ("R&R") [ECF No. 130] at 2. Magistrate Judge Reinhart concluded that: (1) "[t]he Defendants are immune from all of Plaintiffs' claims except the PPE hoarding claims"; (2) "Counts I–V [of the Amended Complaint] should be dismissed without prejudice for lack of subject matter jurisdiction"; and (3) the "FSIA does not immunize Defendants from the hoarding conduct alleged in Counts VI–IX." *Ibid.* Magistrate Judge Reinhart then cautioned the parties as follows:

> A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Roy K. Altman, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11TH CIR. R. 3-1 (2016).

*Id.* at 15.

Both the Plaintiffs and Defendant PetroChina[1] filed objections to the R&R. *See* PetroChina's Objections to R&R ("PetroChina Objections") [ECF No. 135]; Plaintiffs' Objections to R&R ("Plaintiffs' Objections") [ECF No. 136]. And the parties responded to the other side's objections. *See* PetroChina's Response to Plaintiffs' Objections ("PetroChina Response") [ECF No. 139]; Plaintiffs' Response to Objections by PetroChina ("Plaintiffs' Response") [ECF No. 140]. After careful review, we **REJECT** one narrow portion of Magistrate Judge Reinhart's R&R—his finding that PetroChina is the agency or instrumentality of a foreign state—and **ADOPT** the rest.

---

[1] The CCP and PRC never appeared in this action and are currently in default. *See* Clerk's Entry of Default [ECF No. 111].

**THE FACTS**

In their operative Amended Complaint, the Plaintiffs allege that the PRC and the CCP are responsible for a "concerted and deliberate effort[ ] to both buy up as much of the world's inventory of PPE and respirators, but also to prevent [Chinese] factories from exporting PPE" during the COVID-19 pandemic. Amended Complaint ¶ 139. The purpose of this scheme, the Plaintiffs explain, was for the Chinese government to "control the mask and medical supply market" and "curry political favor around the world as they try to unseat the United States as the leading super-power, by pretending to provide the supplies to hard-hit countries that would not have needed the aid, had they not cornered the [PPE] market." *Id.* ¶¶ 150, 153. As for PetroChina, the Plaintiffs allege that the CCP and the PRC directed PetroChina's employees to "buy as many masks as possible" from American pharmacies and stores so that they could be "export[ed] back to China." *Id.* ¶ 147. Put another way, the Plaintiffs accuse PetroChina of aiding and abetting the PRC's and the CCP's alleged tortious acts by "hoarding PPE in the U.S." at the behest of the Chinese government. *Id.* ¶ 154.

The Plaintiffs also allege that they (along with hundreds of thousands of other medical personnel) were harmed by the Defendants' scheme because they were "unable to procure proper or adequate PPE[.]" *Id.* ¶ 157. As a result, the Plaintiffs accuse the Defendants of causing "deaths, infections, and other physical and emotional harms of medical providers within the United States and Florida . . . who have lacked proper and adequate PPE[.]" *Id.* ¶ 155. The Plaintiffs advance nine counts against the Defendants. *See generally id.* ¶¶ 168–226. The first five counts (Counts I–V) assert common-law torts against the Defendants: negligence (Count I), *see id.* ¶ 169; toxic battery and civil assault (Count II), *see id.* ¶ 177; negligent infliction of emotional distress (Count III), *see id.* ¶ 183; intentional infliction of emotional distress (Count IV), *see id.* ¶ 188; and, as to Defendant PetroChina only, civil aiding and abetting, *see id.* ¶ 193. The remaining four counts assert claims under the Sherman Anti-Trust Act. *See generally* 15 U.S.C. §§ 1–2. Count VI alleges that the CCP and the PRC monopolized the

mask and PPE market, in violation of 15 U.S.C. § 2. *See* Amended Complaint ¶ 199. Count VII asserts (in the alternative) that the CCP and the PRC attempted to monopolize the mask and PPE market, in violation of 15 U.S.C. § 2. *See id.* ¶ 211. Count VIII claims that all the Defendants engaged in a conspiracy to monopolize the mask and PPE markets, in violation of 15 U.S.C. § 2. *See id.* ¶ 215. And Count IX asserts that all three Defendants entered into a "contract, combination, or conspiracy to restraining the trade and commerce of surgical grade masks and PPE in the United States," in violation of 15 U.S.C. § 1. *Id.* ¶ 223.

Although Defendant PetroChina appeared relatively early on in this case, *see* PetroChina Notice of Appearance [ECF No. 30] (appearing on August 17, 2020), the Plaintiffs had some difficulty serving the PRC and the CCP. To make a long story short, we gave the Plaintiffs permission "to contact the U.S. Department of State directly to effectuate service on [the PRC and CCP]" and stayed and closed the case pending service. Dec. 20, 2021, Order [ECF No. 64] at 2. On August 3, 2023, the Plaintiffs moved to reopen the case, explaining that "the State Department did not serve the China Based Defendants through the Beijing Embassy until January 18, 2023[,]" and that, when the CCP and PRC "responded through a 'diplomatic note' on February 2, 2023[,]" they said that they were immune from suit and that this litigation was "vexatious." Motion to Reopen [ECF No. 91] at 2.

On October 20, 2023, we held a hearing on the status of the case. *See* Oct. 20, 2023, Paperless Minute Entry [ECF No. 105]. We made two important findings at this hearing. *First*, we determined that service on the PRC and the CCP "was proper" and ordered the Plaintiffs to "file a motion for clerk's entry of default[.]" Oct. 20, 2023, Hr'g Tr. [ECF No. 113] at 5:3–8. *Second*, and because the PRC and the CCP would soon be in default, we ordered the Plaintiffs to file a "motion for default judgment only on the question of jurisdiction[.]" *Id.* at 10:17–18. We explained that we would only entertain a motion for default judgment against the PRC and the CCP if we first found that we had subject-matter jurisdiction under the FSIA. *See id.* at 10:3–5 ("And if I deny [the SMJ Motion], case is

4

over; if I grant it, then we can move to the second phase of briefing on personal jurisdiction, venue, and the merits.").

In their SMJ Motion, the Plaintiffs argued that two exceptions to the FSIA's broad grant of sovereign immunity to foreign states apply here: the "commercial activity" exception (28 U.S.C. § 1605(a)(2)) and the "noncommercial tort" exception (28 U.S.C. § 1605(a)(5)). *See* SMJ Motion at 11. In considering the Plaintiffs' arguments, Magistrate Judge Reinhart adopted the analysis of the Eighth Circuit in *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930 (8th Cir. 2024), which considered nearly identical claims against the Chinese government. *See* R&R at 8 ("The First Amended Complaint—factually similar to the complaint before the Eighth Circuit in *Missouri ex rel. Bailey*—alleges that the Defendants are a foreign state that breached its duty of care to Plaintiffs by allowing COVID-19 to spread, blocking the dissemination of information about the virus, and 'hoarding' PPE."). Magistrate Judge Reinhart first found that the "noncommercial tort" exception didn't apply because the Defendants' "decisions are 'susceptible to policy analysis' and therefore outside the purview of American courts." *Id.* at 9 (quoting *Bailey*, 90 F.4th at 936).

The Magistrate Judge's analysis of the "commercial activity" exception, however, was much more involved. As to the Plaintiffs' tort claims (Counts I–V), Magistrate Judge Reinhart determined that the Defendants' "alleged deception behind the spread of COVID-19" didn't "meet the statutory definition of 'commercial activity," and that (even if it did) its "effects were 'remote and attenuated' rather than direct." *Id.* at 10 (quoting *Bailey*, 90 F.4th at 937). Accordingly, Magistrate Judge Reinhart concluded that the "commercial activity exception does not apply to the tort claims against all Defendants" and, therefore, that Counts I–V should be dismissed for lack of subject-matter jurisdiction. *Id.* at 11.

But Magistrate Judge Reinhart came out the other way on the Sherman Act claims (Counts VI–IX). Again relying on the Eighth Circuit's decision in *Bailey*, Magistrate Judge Reinhart found that

the Defendants' "alleged anticompetitive actions" in "hoarding" PPE from around the world *was* "commercial in nature" and that these commercial activities "had a direct effect in the United States," given China's "superior power to influence the worldwide PPE market[.]" *Id.* at 12 (citing *Bailey*, 90 F.4th at 938–39). Magistrate Judge Reinhart also rejected PetroChina's position that the "Plaintiffs' PPE hoarding claims do not survive without their tort claims" because the Plaintiffs plausibly alleged that "China leveraged the world's ignorance about COVID-19 by manipulating the worldwide PPE market." *Id.* at 13 (quoting *Bailey*, 90 F.4th at 939). In short, Magistrate Judge Reinhart concluded that, unlike Counts I–V, the FSIA's "commercial activity" exception applies to Counts VI–IX of the Amended Complaint.

## THE LAW

### I.     Review of a Magistrate Judge's R&R

District courts must review *de novo* any part of a magistrate judge's disposition that has been properly objected to. *See* FED. R. CIV. P. 72(b)(3). Although Rule 72 itself is silent on the standard of review, the Supreme Court has acknowledged that Congress's intent was to require a *de novo* review only where objections have been properly filed—and not when neither party objects. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate [judge]'s factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."). "If no objection or only [a] partial objection is made to the magistrate judge's report, the district judge reviews those unobjected portions for clear error." *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006) (quoting *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999) (cleaned up)).

When a party timely objects to a magistrate judge's report and recommendation, the district judge must make a *de novo* determination "of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also Leonard v.*

*Polk Cnty. Sheriff's Dep't*, 2019 WL 11641375, at *1 (M.D. Fla. Apr. 16, 2019) (Jung, J.). "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court." *United States v. Tardon*, 493 F. Supp. 3d 1188, 1209 (S.D. Fla. 2020) (Lenard, J.) (quoting *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988)). The "[f]ailure to object to the magistrate [judge]'s factual findings after notice precludes a later attack on these findings." *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988) (citation omitted).

## II.     The Foreign Sovereign Immunities Act

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). It "provides that 'a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States' except as provided in the Act." *Samantar v. Yousuf*, 560 U.S. 305, 313 (2010) (quoting 28 U.S.C. § 1604). The term "foreign state" means both "a body politic that governs a particular territory" and that state's "political subdivisions, agencies, and instrumentalities." *Id.* at 314 (citing 28 U.S.C. § 1603(a)). A foreign state's "agency or instrumentality" includes any entity that: (1) "is a separate legal person, corporate or otherwise"; (2) "is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof"; and (3) "is neither a citizen of a State of the United States . . . nor created under the laws of any third country." 28 U.S.C. § 1603(b)(1)–(3).

While the FSIA "creates a baseline of immunity from suit" for foreign states, it also provides "specified exception[s]" to this immunity. *Glob. Marine Exploration, Inc. v. Republic of Fr.*, 33 F.4th 1312, 1318 (11th Cir. 2022) (cleaned up); *see also generally* 28 U.S.C. § 1605(a)(1)–(6). If none of the FSIA's exceptions applies "then the district court lacks subject matter jurisdiction over the plaintiff's claims." *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1312 (11th Cir. 2009) (citing *Mwani v. bin Laden*, 417 F.3d 1, 15

(D.C. Cir. 2005)). To establish subject-matter jurisdiction under the FSIA, "the plaintiff must overcome the presumption that the foreign state is immune from suit by producing evidence that the conduct which forms the basis of the complaint falls within one of the statutorily defined exceptions." *Ibid.* (cleaned up). If the plaintiff successfully "asserts facts suggesting that an exception to foreign sovereign immunity exists," then the burden shifts to the defendants to prove "by a preponderance of the evidence that the exception does not apply." *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1290 (11th Cir. 1999).

ANALYSIS

Neither party is fully satisfied with Magistrate Judge Reinhart's R&R. PetroChina advances two major objections. *One*, it says that it's "a citizen of a State of the United States and cannot be deemed an agent or instrumentality of a foreign state." PetroChina Objections at 6 (cleaned up). *Two*, it argues that Magistrate Judge Reinhart erred in at least three salient ways when he found that "Counts VI–IX fell within the commercial activity exception" to the FSIA. *Id.* at 7.

The Plaintiffs also raise two objections to the R&R. *First*, they insist that the FSIA's noncommercial-tort exception applies because "[t]he Amended Complaint clearly discusses illegal acts both inside China and in the United States by China and its agents[.]" Plaintiffs' Objections at 5. *Second*, they continue to assert that the commercial-activity exception applies to Counts I–V of the Amended Complaint because "a virus, likely created or manipulated in the [Wuhan Institute of Virology Lab], [which] essentially shut down the U.S. and the world in mere months" cannot be characterized as "remote and attenuated in effect." *Id.* at 7. We'll take each of these arguments in turn.

## I.     PetroChina's Objections

### A.  PetroChina's Status as an Instrumentality of a Foreign State

PetroChina's first objection is to Magistrate Judge Reinhart's finding that "PetroChina America is also a foreign state under [the] FSIA" because it's covered under the "'agencies and

instrumentalities' definition of 'foreign state.'" R&R at 8–9. PetroChina says that it can't be an "agency or instrumentality" of the Chinese government because it's a New Jersey corporation. *See* PetroChina Objections at 6 ("Under Section 1332(c), PetroChina is a citizen of New Jersey because that is its place of incorporation. PetroChina is therefore 'a citizen of a State of the United States' and cannot be deemed an agency or instrumentality of a foreign state." (cleaned up) (quoting 28 U.S.C. § 1603(b)(3))). The Plaintiffs don't appear to take a position on this issue—and instead argue that PetroChina is improperly bringing arguments on behalf of the defaulted Defendants (*i.e.*, the CCP and the PRC). *See* Plaintiffs' Response at 4–5 ("Plaintiffs did not make any particular allegation as to whether PetroChina was an instrumentality of the Foreign Defendants, but certainly did allege that PetroChina acted at the beck and call of the Foreign Defendants. If PetroChina is correct, that under the statute, they do not meet all of the requirements for being an instrumentality, it only appears to bolster the argument by Plaintiffs that PetroChina is improperly standing in the shoes of the Foreign Defendants, and does not have the standing to seek the dismissal of this action against them.").

As we discussed above, *see ante*, at 7–8, the FSIA "specifically delimits what counts as an agency or instrumentality." *Samantar*, 560 U.S. at 314. Those requirements, to recap, are that the entity: (1) "is a separate legal person, corporate or otherwise"; (2) "is an organ of a foreign state . . . or a majority of whose shares or other ownership interest is owned by a foreign state"; and (3) "is neither a citizen of a State of the United States . . . nor created under the laws of any third country." 28 U.S.C. § 1603(b)(1)–(3). Magistrate Judge Reinhart found that PetroChina met the FSIA's "agency or instrumentality" definition because it's wholly owned by PetroChina International—which, in turn, is owned by the Chinese government. *See* R&R at 8–9 ("According to the Complaint, PetroChina America is a subsidiary of PetroChina International—which is owned by China. Therefore, PetroChina America is also a foreign state under FSIA."). While PetroChina concedes that it "is a separate corporation from a foreign state," and that it "is owned by a foreign state or political

subdivision thereof," it insists that it *can't* be a foreign agent or instrumentality because it "is a citizen of New Jersey." PetroChina Objections at 5–6.

We agree with PetroChina that it doesn't meet the statutory definition of an "agency or instrumentality" because it's a "citizen of a State of the United States as defined in section 1332(c) and (e) of [Title 28]." 28 U.S.C. § 1603(b)(3). A corporation "shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business[.]" 28 U.S.C. § 1332(c)(1). The parties agree that PetroChina is a citizen of New Jersey because it's incorporated in that state. *See* Amended Complaint ¶ 20 ("PetroChina is a New Jersey corporation[.]"); PetroChina Objections at 6 ("Under Section 1332(c), PetroChina is a citizen of New Jersey because that is its place of incorporation.").

Neither party specifically tells us where PetroChina's principal place of business is, although the Plaintiffs allege that PetroChina is "headquartered in Texas[.]" Amended Complaint ¶ 20. Unfortunately, a "mere[ ] assert[ion] that [PetroChina] [is] headquartered in the state of [Texas] [is] insufficient on its own to establish its principal place of business[.]" *Mercola v. N.Y. Times Co.*, 2024 WL 3443465, at *1 (11th Cir. May 6, 2024) (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010)). While this is a major pleading deficiency, we don't think it affects the outcome of this case because both sides agree that PetroChina—whatever its principal place of business—is a citizen of the United States. *See* Amended Complaint ¶ 20 ("PetroChina is a New Jersey corporation, headquartered in Texas, and registered to do business in and accept service of process in Florida. . . . It is one of the largest oil and gas traders in the United States[.]"); PetroChina Objections at 6 ("PetroChina is therefore 'a citizen of a State of the United States' and cannot be deemed an agency or instrumentality of a foreign state.").

And, notwithstanding PetroChina's connection to the Chinese government, § 1603(b)'s definition of "agency or instrumentality" plainly excludes domestic corporations—even if they're

wholly owned by a foreign sovereign. *See Gould v. Aerospatiale Helicopter Corp.*, 40 F.3d 1033, 1034 (9th Cir. 1994) ("Section 1332(c) provides that a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business. Because the domestic distributor was incorporated in Delaware and had its principal place of business in Texas, it was not a foreign state within the meaning of the statute." (cleaned up)); *Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 197 (9th Cir. 2019) ("Nor is either Assa entity an agency or instrumentality of a foreign state as the FSIA defines that term. Under 28 U.S.C. § 1603(b)(3), an agency or instrumentality must be neither a citizen of a State of the United States as defined in 28 U.S.C. §§ 1332(c) and (e), nor created under the laws of any third country. Assa Corporation is a citizen of a state (New York) within the meaning of § 1332(c), and Assa Co. Ltd. is incorporated under the laws of a third country (Jersey, Channel Islands)."). We'll therefore **SUSTAIN** PetroChina's first objection and **REJECT** "the Report and Recommendation's finding that PetroChina is an agency or instrumentality of a foreign state." PetroChina Objections at 6.[2]

## B.  The Application of the Commercial-Activity Exception to Counts VI–IX

In its second objection, PetroChina claims that Magistrate Judge Reinhart "completely ignored binding Eleventh Circuit precedent, Plaintiffs' own admissions, and the 'in connection with' language in the FSIA" when he found that "Counts VI–IX fell within [FSIA's] commercial activity exception[.]" *Id.* at 7.[3] This objection is based on what PetroChina believes to be four different errors Magistrate

---

[2] Because PetroChina isn't an agency or instrumentality of a foreign state, it cannot avail itself of China's sovereign immunity under the FSIA. We therefore also **REJECT** any portion of Magistrate Judge Reinhart's R&R that recommends dismissing *any* counts against PetroChina for lack of subject-matter immunity.

[3] Because PetroChina isn't subject to the FSIA, *see ante*, at 8–11, we take the Plaintiffs' point that PetroChina has lodged an "improper Objection on behalf of the non-appearing and defaulted Foreign Defendants . . . since they lack standing to seek dismissal of the Foreign Defendants," Plaintiffs' Response at 3; *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]his Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). Even so, the applicability of the FSIA's exceptions directly implicates our subject-matter jurisdiction, and we "are obligated to inquire into our subject-matter

Judge Reinhart made. *First*, PetroChina attacks Magistrate Judge Reinhart's reliance on the Eighth Circuit's decision in *Bailey*, arguing that *Bailey* "is not persuasive authority and [that it] contradicts Eleventh Circuit precedent." *Id.* at 8. *Second*, PetroChina contends that Magistrate Judge Reinhart ignored the fact that the Defendants' alleged hoarding of PPE was "based on purportedly tortious, rather than commercial, activity because [it] cannot be separate from [the Plaintiff's] claims relating to the handling of COVID-19 (Counts I–V)." *Id.* at 10. *Third*, PetroChina says that Magistrate Judge Reinhart "ignored the 'in connection with' language and binding Eleventh Circuit case law interpreting that language." *Id.* at 11. *Fourth*, PetroChina insists that Magistrate Judge Reinhart "improperly found that [the] Plaintiffs' PPE claims had a direct effect in the United States" because the "potential economic harms from the alleged stockpiling of PPE" couldn't have "had an 'immediate' effect on any alleged PPE shortage in the United States." *Id.* at 12–13.

The "commercial activity" exception "provides for jurisdiction over foreign states when at least one of its three clauses applies[.]" *Devengoechea v. Bolivarian Republic of Venez.*, 889 F.3d 1213, 1220 (11th Cir. 2018). For the exception to apply, the action must be based: "(1) upon a commercial activity carried on in the United States by the foreign state; or (2) upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or (3) upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere [if] that act causes a direct effect in the United States." *Ibid.* (quoting 28 U.S.C. § 1605(a)(2)).

A "commercial activity" is defined as both the "regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). "While the definition in § 1603(d) leaves the critical term commercial largely undefined, the Supreme Court has explained that 'when a

---

jurisdiction sua sponte whenever it may be lacking." *Cadet v. Bulger*, 377 F.3d 1173, 1179 (11th Cir. 2004) (cleaned up). So, whether we take this issue up in the context of PetroChina's objection to the applicability of the commercial-activity exception or as a *de novo* review of our own jurisdiction, the result is the same.

foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA.' Additionally, because the FSIA provides that the commercial character of an act is to be determined by reference to its nature rather than its purpose, the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives." *Glob. Marine Expedition*, 33 F.4th at 1318 (quoting *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 612 (1992)); *see also Africa Growth Corp. v. Republic of Angl.*, 2023 WL 3590409, at *7 (11th Cir. May 23, 2023) ("To decide whether an activity is commercial, we look at whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce. Assessing the commercial character of an act is a question of behavior, not motivation." (cleaned up)).

As for the "direct effect" prong, a plaintiff must show that the foreign state's commercial activity had "an immediate consequence" in the United States. *Weltover*, 504 U.S. at 618. This effect "must be more than purely trivial or remote and attenuated, but it need not be a substantial or foreseeable effect." *Devengoechea*, 889 F.3d at 1224 (cleaned up). The "question presented" by the "direct effect" requirement is whether "the effect [is] sufficiently direct and sufficiently in the United States that Congress would have wanted an American court to hear the case[.]" *Guevara v. Republic of Peru*, 608 F.3d 1297, 1309 (11th Cir. 2010) (cleaned up) (quoting *Harris Corp. v. Nat'l Iranian Radio & Television*, 691 F.2d 1344, 1351 (11th Cir. 1982)).

Magistrate Judge Reinhart found that the commercial-activity exception applied to Counts VI–IX of the Amended Complaint. Those counts allege that the Defendants attempted to create a monopoly over the world's supply of PPE by engaging "in anti-competitive exclusionary and predatory conduct, including by creating an artificial (or otherwise) need for the masks and PPE by unleashing a deadly virus, concealing it, and failing to contain and warn about it, such that masks and

PPE would be in unprecedented demand, while at the same time stopping exports from its dominant manufacturing base, secretly buying up the world's supplies and enlisting agents and sympathizers to buy up localized mask and PPE supplies and ship them back to China." Amended Complaint ¶ 206; *see also* R&R at 11–12 (same) (citing Amended Complaint ¶¶ 141, 207). Relying almost exclusively on the Eighth Circuit's decision in *Bailey*, Magistrate Judge Reinhart concluded that these "PPE hoarding" counts fell within the commercial-activity exception. Magistrate Judge Reinhart began by noting that "[t]aking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment are the actions of 'a private player' in the market. The same goes for the act of selling those items for a profit." R&R at 12 (quoting *Bailey*, 930 F.3d at 938). Magistrate Judge Reinhart then found that the Defendants' commercial activities "had a 'direct effect in the United States'" because of China's "superior power to influence the worldwide PPE market, including the PPE market in the United States." *Ibid.* Again quoting extensively from *Bailey*, Magistrate Judge Reinhart remarked that the Defendants' ability "to maintain its stockpile [of PPE] and prolong the shortage" meant that the "market effects depended little, if at all, 'on variables independent' of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time." *Id.* at 13 (quoting *Bailey*, 890 F.3d at 939).[4]

Finally, Magistrate Judge Reinhart concluded that the Defendants' "commercial activities have a 'connection with' the 'particular conduct' that constitutes the gravamen of the suit, that is the PPE hoarding." *Ibid.* (citing *Devengoechea*, 889 F.3d at 1222). Magistrate Judge Reinhart rejected PetroChina's

---

[4] Chief Judge Smith dissented from this part of the Eighth Circuit's opinion. *See Bailey*, 90 F.4th at 941 (Smith, C.J., concurring in part and dissenting in part) ("In determining whether China's hoarding of PPE had a direct effect in the United States, 'the question is, was the effect sufficiently *direct* and sufficiently *in the United States* that Congress would have wanted an American court to hear the case?' Here, the ripple effects that Missouri complains of occurred at the end of a long chain of causation. . . . [T]he effect of hoarding would have manifested only over time with the spread of COVID *and* resulting consumption of and need for PPE that became more urgent over time." (cleaned up) (quoting *Guevara*, 608 F.3d at 1309)).

counterargument "that the PPE hoarding is not the gravamen of the suit." *Ibid.* In fact, Magistrate Judge Reinhart said, "the Complaint still plausibly alleges that at the time of the alleged hoarding, the world was unaware of the scope of the pandemic. Plaintiffs allege the same theory Missouri brought before the Eighth Circuit—'China leveraged the world's ignorance about COVID-19 by manipulating the worldwide PPE market.'" *Ibid.* (cleaned up) (quoting *Bailey*, 90 F.4th at 939); *see also Bailey*, 90 F.4th at 939 ("Missouri's overarching theory is that China leveraged the world's ignorance about COVID-19. One way it did so was by manipulating the worldwide personal-protective-equipment market. Missouri must still prove it, but it has alleged enough to allow the claim to proceed beyond a jurisdictional dismissal on the pleadings.").

PetroChina's primary objection to this part of Magistrate Judge Reinhart's R&R—which is intertwined with its other three objections—is that *Bailey* "is "non-binding," "not persuasive," and "contradicts Eleventh Circuit precedent." PetroChina Objections at 8. We (of course) aren't bound by decisions of the Eighth Circuit. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) ("Under the established federal legal system the decisions of one circuit are not binding on other circuits."). But *Bailey* (and other out-of-circuit cases) can be persuasive when the Eleventh Circuit hasn't weighed in on the issue before. *See Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1062 (11th Cir. 2010) ("Because our precedent is relatively sparse in this area, we consider decisions from other circuits as persuasive authority."); *Arriaga v. Fla. Pacific Farms, LLC*, 305 F.3d 1228, 1240 n.15 (11th Cir. 2002) ("Just as this court should respect and carefully weigh the views of other circuits, a district court should do likewise." (cleaned up)).

While we reject PetroChina's maximalist position that *Bailey* isn't even persuasive authority, we agree that we can't rely on out-of-circuit cases when they conflict with binding Eleventh Circuit precedent. *See Palermo v. United States*, 2023 WL 5015483, at *5 (S.D. Fla. Aug. 7, 2023) (Bloom, J.) ("However, those out of circuit cases are not binding on this Court and contradict binding precedent

in this circuit."); *cf. Arriaga*, 305 F.3d at 1240 n.15 ("The district court stated that it 'is bound by the opinions of the Courts of Appeal.' Even if the Fifth Circuit opinion was on point, it would not be binding on this court or the district court. . . . [O]nly the decisions of the Supreme Court and this court are binding on the district courts of this circuit."). PetroChina says that "the Eighth Circuit's finding that taking over factories and restricting the export of PPE was commercial activity[ ] directly contradicts Eleventh Circuit precedent." PetroChina Objections at 8. Specifically, PetroChina says that *Bailey* contradicts the Eleventh Circuit's unpublished decision in *Sequeira v. Republic of Nicaragua*, 815 F. App'x 345 (11th Cir. 2020), and Judge Davis's district-court decision in *Chisholm & Co. v. Bank of Jamaica*, 643 F. Supp. 1393 (S.D. Fla. 1986) (Davis, J.).

But neither *Sequeira* nor *Chisholm* is binding precedent, either. *See United States v. Izurieta*, 710 F.3d 1176, 1179 (11th Cir. 2013) ("Unpublished opinions are not binding precedent."); *Great Lakes Ins. SE v. Crabtree*, 673 F. Supp. 3d 1301, 1309 (S.D. Fla. 2023) (Altman, J.) ("But 'a decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (cleaned up) (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)).

Nevertheless, the majority opinion in *Bailey* implicitly disagreed with part of the Eleventh Circuit's decision in *Guevara*—a published case that *is* binding on us. In *Guevara*, remember, the Eleventh Circuit held that the effect of the foreign entity's commercial activities must be "sufficiently direct and sufficiently in the United States that Congress would have wanted an American court to hear the case[.]" 608 F.3d at 1309 (cleaned up); *accord Bailey*, 90 F.4th at 941 (Smith, C.J., concurring in part and dissenting in part) ("In determining whether China's hoarding of PPE had a direct effect in the United States, 'the question is, was the effect sufficiently *direct* and sufficiently *in the United States* that Congress would have wanted an American court to hear the case?'"). The Eighth Circuit rejected this definition of "direct effect." *See Bailey*, 90 F.4th at 939 ("Nor do we, contrary to the dissent's

16

suggestion, measure the scope of the effect by reference to what 'Congress would have wanted' us to do. The Supreme Court, after all, has instructed us to pay attention only to 'what Congress enacted': a statute lacking a substantiality or foreseeability requirement." (cleaned up) (quoting *Weltover*, 504 U.S. at 618)). To the limited extent that *Bailey*'s articulation of the "direct effect" prong conflicts with the Eleventh Circuit's decision in *Guevera*, we must follow the Eleventh Circuit's prior precedent and ignore *Bailey*'s definition.

Notwithstanding the tension between *Bailey* and *Guevera*, we still find, for three reasons, *Bailey* persuasive. *First*, Magistrate Judge Reinhart properly cited *Bailey* when he found that the Defendants' "alleged anticompetitive actions are commercial in nature[.]" R&R at 12. The Plaintiffs allege that the Defendants "hoarded PPE," restricted the ability of non-Chinese entities "to purchase masks and PPE," and even ordered "employees of Chinese owned businesses . . . to scour stores and supplies for masks." *Id.* at 11–12 (quoting Amended Complaint ¶¶ 141, 207). We agree with Magistrate Judge Reinhart and the Eighth Circuit that "[t]aking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment are the actions of 'a private player' in the market," and that "[b]uying and selling personal-protective equipment is much more like . . . a 'commercial activity' [rather than] a 'sovereign' one," since this is "classic anticompetitive behavior" akin to a private corporation trying to consolidate its market share in a certain industry. *Bailey*, 90 F.4th at 938 (citing *Weltover*, 504 U.S. at 614); *see also Hond. Aircraft Registry, Ltd. v. Gov't of Hond.*, 129 F.3d 543, 548 (11th Cir. 1997) ("A foreign state is commercially engaged when it acts like an ordinary private person, not like a sovereign, in the market.").

PetroChina argues that Counts VI–IX aren't based on commercial activities because they're inextricably intertwined with the Defendants' obligations, as a sovereign, to respond to the COVID-19 pandemic. *See* PetroChina Objections at 10 ("Therefore, Counts VI-IX are based on purportedly tortious, rather than commercial, activity because they cannot be separated from the claims relating to

the handling of COVID-19 (Counts I-V).”); *see also OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015) (“[A commercial] action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit.” (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 358 (1993))). But the “gravamen” of Counts VI–IX is that the Plaintiffs were harmed by the Defendants' “commercial activities”—*viz.* the hoarding of the world's PPE supply. *See* Amended Complaint ¶ 206 (“The CCP and/or the PRC engaged in anti-competitive exclusionary and predatory conduct, including by creating an artificial (or otherwise) need for the masks and PPE by unleashing a deadly virus, concealing it, and failing to contain and warn about it, such that masks and PPE would be in unprecedented demand, while at the same time stopping exports from its dominant manufacturing base, secretly buying up the world's supplies and enlisting agents and sympathizers to buy up localized mask and PPE supplies and ship them back to China.”).

As the Eighth Circuit explained in *Bailey*, “[t]aking over mask-producing factories and buying up a substantial portion of the world's supply of personal-protective equipment are the actions of 'a private player' in the market,” even if the Defendants' rationale for behaving as a “private player” was intertwined with their sovereign objectives. 90 F.4th at 938; *see also id.* at 939 (“Finally, the commercial activity also has a connection with the particular conduct that constitutes the gravamen of the suit. . . . Missouri's overarching theory is that China leveraged the world's ignorance about COVID-19. One way it did so was by manipulating the worldwide personal-protective-equipment market. Missouri must still prove it, but it has alleged enough to allow the claim to proceed beyond a jurisdictional dismissal on the pleadings.” (cleaned up) (first citing *Sachs*, 577 U.S. at 35; and then citing *Nelson*, 507 U.S. at 357)).

*Second*, PetroChina's argument that Magistrate Judge Reinhart “ignored the 'in connection with' language and binding Eleventh Circuit case law interpreting that language” is neither here nor there. PetroChina Objections at 11. PetroChina appears to suggest that—even if the Defendants' acts

18

could be described as "commercial" in nature—they were performed "in the context of [the Defendants'] handling of a global pandemic" and must *still* be considered sovereign (not commercial) acts because we must "consider any purportedly commercial activity in the context in which it arose." *Ibid.* This argument—which is just a restatement of PetroChina's first objection, *see ante*, at 16–17— relies on two cases: *Sequeira* and *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159 (11th Cir. 2011). *See* PetroChina Objections at 11. Neither case helps the Defendants here.

*Odyssey Marine* concerned the salvage of the *Mercedes*, "a Spanish vessel that sank in 1804." 657 F.3d at 1166. The Eleventh Circuit there concluded that the *Mercedes* couldn't be arrested under another provision of the FSIA (28 U.S.C. § 1609), because "providing protection and safe passage to property of Spanish citizens was a military function of the Spanish Navy, especially in times of war or threatened war"—and, therefore, that the vessel was "of a sovereign nature." *Id.* at 1177. The fact that the *Mercedes* also "transport[ed] private cargo of Spanish citizens for a charge" didn't transform it into a "commercial" vessel because its primary function was still that of a naval "warship." *Ibid. Sequeria*, on the other hand, stands for the basic proposition that "the alleged taking of [the plaintiff's] land" was "not a commercial activity" because the Nicaraguan government wasn't "participat[ing] in a transaction as a private party would." 815 F. App'x at 350–51 (citing *Beg v. Islamic Republic of Pak.*, 353 F.3d 1323, 1325 (11th Cir. 2003)).

These cases are inapposite here. The confiscation of private land and the use of a naval frigate to patrol the seas of the Spanish Empire are obviously sovereign acts, whereas the attempted monopolization of the PPE market (as pled in the Amended Complaint) is plainly a "commercial activity." *See Bailey*, 90 F.4th at 938 ("Buying and selling personal-protective equipment is much more like the latter, a 'commercial activity,' than the former, a 'sovereign' one." (citing *Weltover*, 504 U.S. at 614)); *cf. Glob. Marine*, 33 F.4th at 1322 (holding that actions such as "fundraising, contracting with organizations and businesses . . . , and overseeing the logistics of [a] project" are "commercial in nature

and of the type negotiable among private parties" (cleaned up)).[5] And we've found nothing in any Eleventh Circuit case to suggest that we have the discretion, at this stage of the case, to engage in a "contextual" inquiry to determine whether a foreign defendant's acts are truly "in connection with" a commercial activity.

*Third*, the Defendants' alleged PPE hoarding had a "direct effect" in the United States because the Plaintiffs pled that "China had superior power to influence the worldwide PPE market, including the PPE market in the United States." R&R at 12. In PetroChina's view, both Magistrate Judge Reinhart and the Eighth Circuit failed to understand that the "potential economic harms from the alleged stockpiling of PPE . . . could not have had an 'immediate' effect on any alleged PPE shortage in the United States." PetroChina Objections at 13 (citing *Guevara*, 608 F.3d at 1309). This is basically the same point Chief Judge Smith made in his partial dissent in *Bailey. Cf.* 90 F.4th at 941 (Smith, C.J., concurring in part and dissenting in part) ("Here, the 'ripple effects' that Missouri complains of occurred at the end of a long chain of causation. As the court recognizes, one of the specific allegations is that China bought up much of the rest of the world's supply of masks. Those supply reductions led to an alleged shortage in Missouri, which then allowed China to enter the market with its own lower-quality masks. But the effect of hoarding would have manifested only over time with the spread of COVID and [the] resulting consumption of and need for PPE that became more urgent over time."). But, like Magistrate Judge Reinhart and the *Bailey* majority, we agree that "China's market power and its superior knowledge about the virus meant that no one else other than the defendants had to act to create those [economic] effects," and that "most basic supply-and-demand principles tell us that these

---

[5] The Eleventh Circuit has also rejected the theory that "a profit motive" is a necessary precondition to a showing of "commercial activity" under the FSIA. *See Guevara v. Republic of Peru*, 468 F.3d 1289, 1302 (11th Cir. 2006) ("Peru proposes that 'commercial activity' includes only that which is 'done for a profit motive.' We decline to adopt that test because the Supreme Court has instructed us that the FSIA 'unmistakably commands' that we consider the nature, rather than the purpose, of a transaction, and a 'motive' test treads too closely to an examination of 'purpose.'" (cleaned up)).

market effects depended little, if at all, 'on variables independent' of the defendants' conduct given the information asymmetry and tight timeframe that existed at the time." *Id.* at 939.

The Eleventh Circuit has similarly held that "a 'direct effect' occurs in the United States when 'monies or goods are due in the United States.'" *Devengoechea*, 889 F.3d at 1225 (quoting *Samco Glob. Arms, Inc. v. Arita*, 395 F.3d 1212, 1217 (11th Cir. 2005)). According to the Plaintiffs' allegations, the Defendants affected the supply of PPE in the United States by "importing billions of pieces of PPE from suppliers around the world" and "enlisting employees of Chinese owned businesses including [PetroChina] to scour stores and supplies for masks [in the United States]." R&R at 11–12 (quoting Amended Complaint ¶ 141). That's enough to establish a "direct effect." So, while this is a "close[ ] call," *Bailey*, 90 F.4th at 938, we adopt Magistrate Judge Reinhart's conclusion that the Defendants' alleged scheme to hoard PPE had an "effect sufficiently 'direct' and sufficiently 'in the United States' that Congress would have wanted an American court to hear the case[.]" *Guevara*, 608 F.3d at 1309. PetroChina's second objection is therefore **OVERRULED**.

## II.   The Plaintiffs' Objections

### A.   The Noncommercial-Tort Exception

In their first objection, the Plaintiffs contend that Magistrate Judge Reinhart erred in finding that the FSIA's noncommercial-tort exception didn't apply. *See* Plaintiffs' Objections at 3. Magistrate Judge Reinhart's analysis on this point was straightforward: The Defendants' alleged actions couldn't fall within this exception because they "were discretionary" and "susceptible to policy analysis[.]" R&R at 9 (quoting *Bailey*, 90 F.4th at 936). The Plaintiffs argue that the Magistrate Judge's analysis was incomplete because he failed to consider the fact that Chinese law "erase[s] independent judgment or discretionary thought" and that "there is no discretion to commit, or to have one's officers or agents commit, an illegal act." Plaintiffs' Objections at 4 (quoting *Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980)). We disagree.

The noncommercial-tort exception applies when "money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment[.]" 28 U.S.C. § 1605(a)(5). "For this exception to apply, however, the 'entire tort' must be committed in the United States." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 115 (2d Cir. 2013); *see also Dvoinik v. Republic of Austria*, 2025 WL 589250, at *7 (M.D. Fla. Feb. 24, 2025) (Honeywell, J.) ("The non-commercial-tort exception was drafted primarily to address foreign immunity for traffic accidents and other torts occurring in the United States[.]" (citing *Amerada Hess*, 488 U.S. at 440–41)). The noncommercial-tort exception is also "limited by the 'discretionary function exception,'" *Watson v. Kingdom of Saudi Arabia*, 2024 WL 1344643, at *11 (N.D. Fla. Mar. 30, 2024) (Rodgers, J.), which carves out "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused[,]" 28 U.S.C. § 1605(a)(5)(A).[6]

Courts apply a "two-part inquiry" to determine whether a tortious act is related to a "discretionary function": "(1) 'whether the challenged action involved an element of choice or judgment' or the course of action is mandated by a federal statute, regulation, or policy, and (2) if judgment is exercised, 'whether the choice or judgment was one involving social, economic or political policy.'" *Watson*, 2024 WL 1344643, at *11 (quoting *O'Bryan v. Holy See*, 556 F.3d 361, 383 (6th Cir. 2009)); *see also Bailey*, 90 F.4th at 936 ("The idea behind [the exception for torts arising out of discretionary functions] is to 'prevent judicial second-guessing of decisions grounded in social, economic, and political policy.' It places decisions 'susceptible to policy analysis' outside the purview

---

[6] The noncommercial-tort exception also doesn't cover "claim[s] arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights[.]" 28 U.S.C. § 1605(a)(5)(B). Our case has nothing to do with "malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights[,]" so we won't discuss this exception further.

of American courts." (first quoting *United States v. Gaubert*, 499 U.S. 315, 323 (1991); and then quoting *Croyle ex rel. Croyle v. United States*, 908 F.3d 377, 381 (8th Cir. 2018)).

We agree with Magistrate Judge Reinhart that the noncommercial-tort exception doesn't apply here. For starters, the Plaintiffs allege that the Defendants' torts (in large part) either originated in China or took place in China. *See, e.g.*, Amended Complaint ¶ 44 ("Defendants, knowing that the WIV labs did not abide by proper containment protocols, knowing they housed the most dangerous viruses, knowing they allowed dangerous 'gain of function' manipulation of coronaviruses, allowed the work at WIV to continue for commercial gain, and the profit appetite of the Chinese Academy of Sciences. Because of this, COVID-19 was allowed to escape into the general public."); *id.* ¶¶ 121–22 ("The PRC and CCP allowed these massive public gatherings and the massive exodus from Wuhan despite knowing the risks of COVID-19, including the risk of human-to-human transmission, and the virus's dangerous propensities. The PRC and CCP failed to warn the world of the dangers when it had a very early opportunity to do so."); *id.* ¶ 169 ("Defendants had a duty to medical providers, as defined herein, including Named Plaintiffs and class members in the United States, to not act negligently in their restriction of exports of PPE produced in China and in their procurement of the world's inventory of PPE, during the time they knew of the dangers of the Coronavirus, and the risk of a worldwide and deadly pandemic, such that their actions were unreasonable and caused unnecessary harm."); *id.* ¶ 177 ("Defendants through their active concealment of the dangers of COVID-19, set in motion a virus that, in conjunction with their intentional acts of keeping Named Plaintiffs and class members from being able to procure proper or adequate PPE, allows/allowed that virus to touch Named Plaintiffs and class members in a harmful and offensive manner, infecting them."). Since the Defendants' alleged torts didn't take place *exclusively* within the United States, the Plaintiffs cannot avail themselves of the noncommercial-tort exception. *See Amerada Hess*, 488 U.S. at 441 ("[Section] 1605(a)(5) covers only torts occurring within the territorial jurisdiction of the United States."); *Democratic Nat'l Comm. v.*

*Russian Federation*, 392 F. Supp. 3d 410, 427 (S.D.N.Y. 2019) ("Because the theft was planned and executed from computers in Russia, it is plain that the "entire tort" did not take place in the United States. The DNC has cited no similar case where the noncommercial tort exception was applied when a portion of the conduct of the foreign government occurred outside the United States."); *see also* PetroChina's Response at 5 ("Therefore, because the 'entire tort' was not committed within the United States, the noncommercial tort exception does not apply." (citing *Doe v. Fed. Democratic Republic of Eth.*, 189 F. Supp. 3d 6, 17–19 (D.D.C. 2016)).[7]

Moreover, even if the torts took place in the United States, they easily fall within the discretionary-function carveout. As the Eighth Circuit cogently explained, the CCP's and PRC's policy decisions—*e.g.*, "allow[ing] large gatherings in Wuhan [and] taking legal action against doctors who tried to share information about the virus"—weren't "mandatory or forbidden in China, meaning they were the subject of a 'judgment or choice' by policymakers." *Bailey*, 90 F.4th at 936 (quoting *Riley v. United States*, 486 F.3d 1030, 1032 (8th Cir. 2007)); *see also Broidy Capital Mgmt., LLC v. State of Qatar*, 982 F.3d 582, 593 (9th Cir. 2020) (holding that Qatar's alleged cyberattack against the plaintiff "to influence public opinion in the United States by curtailing the influence of individuals, such as Broidy, who could undermine the standing of the State of Qatar in the United States" was "the type of discretionary judgments that the exclusion was designed to protect" (cleaned up)); *Doe v. Holy See*, 557 F.3d 1066, 1084 (9th Cir. 2009) ("[T]he decision of whether and how to retain and supervise an employee, as well as whether to warn about his dangerous proclivities, are the type of discretionary judgments that the exclusion was designed to protect."). All of this makes sense. A foreign

---

[7] It's true that *PetroChina's* alleged torts took place exclusively within the United States. *See* Amended Complaint ¶ 195 ("PetroChina received a memo from its Chinese-government owned parent company to covertly buy up medical grade masks and PPE and ship them back to China and had its agents and employees in the U.S. do just that."). But that's irrelevant because: (1) PetroChina isn't a foreign entity and is, therefore, not immune from suit under the FSIA; and (2) the CCP's and PRC's alleged tortious acts plainly took place (at least in part) in China.

government's handling of a virus—both within and outside its own borders—is obviously "grounded in social, economic, [and/or] political policy." *Gaubert*, 499 U.S. at 323; *see also Busara v. United States*, 2023 WL 4946460, at *8 (W.D. La. Apr. 27, 2023) ("The difficult task of responding to a global pandemic is precisely the type of scenario 'grounded in social, economic, and political policy' that Congress intended to immunize from 'judicial second-guessing through the medium of an action in tort.'" (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 814 (1984))), *report and recommendation adopted*, 2023 WL 4938479 (W.D. La. Aug. 2, 2023).

The Plaintiffs advance two counterarguments—both unpersuasive. *First*, they say that the Defendants' acts were not discretionary because of "the existence of the Military-Civil Fusion (MCF)"—"a supreme law and dictate of the CCP that requires citizens and Chinese ex-pats alike to do whatever the government tells them to do, erasing any independent judgment or discretionary thought." Plaintiffs' Objections at 4 (citing Amended Complaint ¶¶ 146–47). But this is irrelevant. As PetroChina rightly points out, the Plaintiffs are suing the PRC and the CCP *themselves*, not "the 'citizens and Chinese ex-pats' that are allegedly bound by the MCF." PetroChina Response at 7. According to the Plaintiffs' own allegations, the MCF gives the PRC and the CCP unfettered *discretion* to compel "[a]ll Chinese citizens and companies" to "answer, above all else, to the CCP and the good of the Chinese state." Amended Complaint ¶ 146. In short, the existence of the MCF *supports* Magistrate Judge Reinhart's finding that the Defendants' handling of COVID-19 was "discretionary" and "susceptible to policy analysis[.]" R&R at 9; *see also* PetroChina Response at 8 ("Indeed, Plaintiffs themselves argue throughout the Amended Complaint that the alleged response to COVID-19 or alleged PPE hoarding was done for political gain in an attempt to 'usurp the U.S. as the leading super-power.'" (citing Amended Complaint ¶¶ 143, 153, 207)).

*Second*, the Plaintiffs' position that "there is no discretion to commit, or to have one's officers or agents commit, an illegal act" is not quite right. Plaintiffs' Objections at 4. It's true that the "FSIA's

discretionary function exclusion 'is inapplicable when an employee of a foreign government violates *its own internal law*'" or if a defendant's actions are "clearly contrary to the precepts of humanity" or international law. *Broidy Cap. Mgmt.*, 982 F.3d at 592 (quoting *Risk v. Halvorsen*, 936 F.2d 393, 396 (9th Cir. 1991)); *see also MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 922 n.4 (D.C. Cir. 1987) ("Moreover, it is hardly clear that, even if a criminal act were shown, it would automatically prevent designation of Peru's acts as discretionary. The cases on which appellant relies involve criminal acts of a rather different character and order. We think it not unduly bold to conclude that violations, if any, of a zoning ordinance do not rise to the level of actions *malum in se*." (citing *Letelier*, 488 F. Supp. at 673)). But alleged violations of *American* law by foreign actors *don't* trigger the discretionary-function exclusion. *See Risk*, 936 F.2d at 397 ("Although these acts may constitute a crime under California law, it cannot be said that every conceivably illegal act is outside the scope of the discretionary function exception."); *Usoyan v. Republic of Turkey*, 6 F.4th 31, 43 (D.C. Cir. 2021) ("We also note that fifteen members of the Turkish security detail were subsequently indicted by the United States on criminal assault charges. . . . We conclude that Turkey's immunity is not removed by the plaintiffs' allegations that it violated local law.").

The Plaintiffs appear to allege that the Defendants' "illegal acts" were so despicable that they violated fundamental precepts of international law and "humanity." Plaintiffs' Objections at 4 ("With the death and chaos that resulted from the pandemic, it seems hard to think of a scenario more egregious in our lifetimes."). But the "Plaintiffs point to no law that the Foreign Defendants allegedly violated[,]" PetroChina Response at 9, and neither the Defendants' alleged failure to adequately warn the rest of the world about COVID-19 nor their scheme to hoard PPE during the pandemic can overcome the discretionary-function exclusion. *See, e.g.*, *Broidy Cap. Mgmt.*, 982 F.3d at 592 (holding that "covert cyberespionage" didn't clearly violate international law since "the parties have not pointed us to any sufficiently clear rule of international law that would impose a mandatory and judicially

enforceable duty on Qatar *not* to do what it allegedly did here"); *Doe*, 557 F.3d at 1084 (holding that the Vatican's decision to "cover up incidents of child abuse" was discretionary); *cf. Letelier*, 488 F. Supp. at 673 ("Whatever policy options may exist for a foreign country, it has no 'discretion' to perpetrate conduct designed to result in the assassination of an individual or individuals, action that is clearly contrary to the precepts of humanity as recognized in both national and international law.").

We therefore agree with Magistrate Judge Reinhart that the noncommercial-tort exception doesn't apply here because the alleged torts took place (at least in part) outside the United States and because the Defendants perpetrated those acts in their discretion. The Plaintiffs' objection on this issue is thus **OVERRULED**.

### B. The Commercial Effect of Counts I–V on the United States

The Plaintiffs' second objection is to Magistrate Judge Reinhart's finding that the commercial-activity exception *doesn't* apply to Counts I–V of the Amended Complaint. In Magistrate Judge Reinhart's view, the Defendants' alleged failure to "take adequate steps to raise awareness about—and to prevent—the spread of COVID-19" (*viz.*, the conduct underlying Counts I–V) had a "remote and attenuated rather than direct" effect on the United States. R&R at 10 (cleaned up).[8] The Plaintiffs insist that "the PRC's and CCP's acts in handling the virus, *i.e.* trying to suppress all information and not being proactive in stopping it," *both* were commercial in nature *and* had a "direct effect" in the United States. Plaintiffs' Objections at 5–6. PetroChina responds that this "argument strains credulity" because of the many "intervening factors" that "undermine any direct effect" the Defendants' actions had on the United States. PetroChina Response at 15.

PetroChina and Magistrate Judge Reinhart are exactly right. "A 'direct effect' is one that follows 'as an immediate consequence of the defendant's activity.' The effect must be more than

---

[8] Magistrate Judge Reinhart also doubted that "any of those activities meet the statutory definition of 'commercial activity,'" but he did not reach this issue. R&R at 10 (citing 28 U.S.C. § 1603(d)).

'purely trivial' or 'remote and attenuated,' but it need not be a substantial or foreseeable effect. In evaluating a 'direct effect,' we ask, 'Was the effect sufficiently direct and sufficiently in the United States that Congress would have wanted an American court to hear the case?'" *Devengoechea*, 889 F.3d at 1224 (cleaned up) (first quoting *Weltover*, 504 U.S. at 618; and then quoting *Guevara*, 608 F.3d at 1309). Magistrate Judge Reinhart explained why the Defendants' (alleged) mishandling of the COVID-19 pandemic couldn't have had a "direct effect" in the United States:

> Plaintiffs' theory is that Defendants' conduct—permitting large gatherings in China, failing to acknowledge COVID-19, taking actions against Chinese doctors, and not imposing a ban on travel out of China —had the following effects in the United States: (1) a rise in COVID-19 cases, (2) deaths, (3) overwhelmed hospitals and medical practitioners, and (4) limited access to PPE. The question I'm required to ask is whether the alleged effects were an "immediate consequence of the defendants' activit[ies]." The answer is no. Starting with the spread of COVID-19 which required intervening factors. At least one infected individual had to travel from China to other parts of the world. And then the virus had to spread from one person to another enough to reach the United States. It then takes several more steps for the COVID-19 infections to rise to a level that "overwhelmed" hospitals, medical facilities, and medical practitioners so much so that hospitals and medical facilities either run out of PPE or run low on PPE. For example, many businesses, schools, and local governments, in the United States continued to operate in 2020 until stay-at-home orders were issued. And in that time period, COVID-19 continued to spread, and case counts continued to increase.

R&R at 11; *see also* PetroChina Response at 16 ("All of the factors mentioned [in the R&R] could have led to COVID-19 allegedly 'shutting down the U.S. in mere months': the voluntary travel to the United States of infected individuals; the closing of United States ports; the decisions by states in the United States to not shut down earlier and to stockpile PPE for its citizens; and businesses and schools in the United States deciding to stay open until stay-at-home orders were issued. Plaintiffs do not even attempt to demonstrate how the above factors, whether individually or collectively, did not lead to their alleged contraction of COVID-19."). Since the spread of COVID-19 throughout the United States wasn't "an immediate consequence" of the Defendants' activities, Magistrate Judge Reinhart rightly found that the commercial-activity exception doesn't save Counts I–V.

Still resisting, the Plaintiffs say that China's handling of COVID-19 didn't depend on the "affirmative acts or choice of intervening actors" because "all infected persons had to do were the involuntary acts of breathing, sneezing, or coughing." Plaintiffs' Objections at 6. The Eighth Circuit persuasively rejected this argument in *Bailey*, saying:

> The problem is that, even if [China's "malfeasance and deception"] were commercial, their effects were remote and attenuated, not direct. To be direct, an effect must follow as an *immediate* consequence of the defendants' activity.
>
> No direct causal chain exists here. Start with the spread of the virus itself, which required intervening actors. At least one infected individual (and probably more) had to travel from China to other parts of the world. The virus then had to spread and eventually reach the United States. Only at that point could an infected individual have brought the virus to Missouri.
>
> It took several more steps from there for Missouri's economy to suffer. Infections had to reach a high enough level in the United States and Missouri for federal, state, and local governments to issue stay-at-home orders. Missourians then had to follow them. Only then did schools and businesses close, state expenditures grind to a halt, and medical facilities close their doors to visitors. The point is that it is impossible to directly trace the economic and other harms identified in Missouri's complaint to the virus research in Wuhan, operation of the Chinese healthcare system, and social-media censorship.

90 F.4th at 937–38 (cleaned up).

We agree that the Defendants' alleged malfeasance vis-à-vis the COVID-19 virus cannot be reasonably described as having a "direct effect" in the United States given the innumerable variables—many of them having nothing to do with China—that also contributed to that spread. *Cf. Virtual Countries, Inc. v. Republic of S. Africa*, 300 F.3d 230, 237–38 (2d Cir. 2002) ("The press release's effect thus depended crucially on variables independent of the Republic. This tangled causal web does not provide the requisite immediacy to establish jurisdiction.").[9]

---

[9] Had the Defendants *purposely sent* infected people to the United States to spread the virus here, then the spread of COVID-19 might have been "an immediate consequence of the defendant's activity." But the Plaintiffs don't allege that this happened—and, even if they did, they would still need to show that this act of biological warfare was "taken in connection with a commercial activity[.]" *Devengoechea*, 889 F.3d at 1224.

Magistrate Judge Reinhart correctly found that the commercial-activity exception doesn't apply to Counts I–V of the Amended Complaint because the Defendants' alleged acts had a "remote and attenuated rather than direct" effect on the United States and the Plaintiffs. R&R at 10. We therefore **OVERRULE** the Plaintiffs' second objection.

## CONCLUSION

Having conducted a careful, *de novo* review of the R&R, the record, the pleadings, and the applicable law, we hereby **ORDER AND ADJUDGE** as follows:

1. Magistrate Judge Reinhart's R&R [ECF No. 130] is **ADOPTED in part** and **REJECTED in part**.

   a. We **REJECT** Magistrate Judge Reinhart's finding that PetroChina is an "agency or instrumentality" of a foreign state under 28 U.S.C. § 1603(b). PetroChina's Objections [ECF No. 135] on this point are **SUSTAINED**.

   b. We **ADOPT** all other portions of the Magistrate Judge's R&R. The remaining objections raised by both the Plaintiffs and PetroChina [ECF Nos. 135, 136] are **OVERRULED**.

2. The Plaintiffs' Motion for the Court to find Subject Matter Jurisdiction Under the FSIA [ECF No. 116] is **GRANTED in part** and **DENIED in part**. Counts I–V of the Amended Complaint [ECF No. 19] are **DISMISSED without prejudice** for lack of subject-matter jurisdiction as to Defendants PRC and CCP. Counts VI–IX of the Amended Complaint are properly before the Court.

3. By **June 13, 2025**, the Plaintiff shall file either a motion for final default judgment or a notice of joint liability in accordance with our Order on Default Final Judgment Procedure [ECF No. 112].

**DONE AND ORDERED** in the Southern District of Florida on May 27, 2025.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record